[Crim. No. 18431. In Bank. May 21, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ARCHIE THEODORE RUTHFORD, Defendant and Appellant.

**COUNSEL**

Richard J. Stall, Jr., under appointment by the Supreme Court, and Don W. Goldstein for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Roger W. Boren, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WRIGHT, C. J.**—Defendant Archie Theodore Ruthford appeals from a judgment entered upon convictions by jury of two counts of armed robbery. (Pen. Code, § 211.) He contends that the prosecutor engaged in prejudicial misconduct by failing to disclose to defense counsel the principal motivation for the adverse testimony of a key prosecution witness and by forestalling defense counsel's awareness of such motivation through misrepresentations made to the court. We conclude the prosecutor was guilty of prejudicial misconduct which denied defendant a fair trial and accordingly reverse the judgment.

Two men appeared at an apartment occupied by Mrs. Constance Hannaford and Mr. Ferdinand Castillo. The spokesman for the two, Fred Thomas, said he was looking for a rental apartment for himself and his wife. The men examined a vacant apartment in the same building and thereafter returned to Mrs. Hannaford's apartment. Thomas then produced a gun and announced a "holdup." He and his companion took certain personal property in the possession of Mrs. Hannaford and Mr.

Castillo and ordered them into a bedroom where they were bound face down on a bed. Despite the victims' disclaimers that no more articles of value would be found, the two intruders ransacked the apartment, found a coin collection and threatened to harm the victims if more valuables were discovered. Mr. Castillo offered to disclose where some money was located if the men would not harm Mrs. Hannaford. The two agreed and Mr. Castillo led them from the bedroom to a cache of money in the pocket of a coat hanging in a closet.

After the men left and the victims had freed themselves, Mr. Castillo observed the car from which he had seen the two robbers emerge when they first approached the apartment. He called an alarm to bystanders and rushed to the vehicle. Thomas emerged from the car, ordered Mr. Castillo not to take down the license number and kicked and punched at him. The second man remained in the car which Thomas thereafter reentered and the two drove away.

The car was traced through its license number and was found to be registered in Thomas' name. It was subsequently discovered abandoned in a parking lot. Thomas and defendant, who were neighbors, left Los Angeles with their wives the evening of the robbery and spent several days in Las Vegas. Upon returning they vacated their respective apartments. Several items stolen from the victims were later discovered in a Las Vegas pawn shop.

Mr. Castillo was unable to identify defendant as Thomas' accomplice in the robbery. Mrs. Hannaford was unable to identify defendant from among photographs shown to her, or at a lineup, but positively identified him in court as the second man who had entered her apartment. She testified that she had paid little attention to the accomplice during the robbery, that she had looked directly at him "[j]ust for a split second" but had had a good side view of him and that she had had no opportunity to view defendant's profile until she observed him in the hallway of the courthouse immediately prior to the preliminary hearing.

Thomas himself testified as the final prosecution witness.[1] He named defendant as his accomplice and testified as to the accuracy of the testimony as related by the victims. He further indicated that defendant had been armed with a pistol.

---

[1]Thomas, who had originally been charged with 16 counts of armed robbery entered guilty pleas to 4 counts, including 1 count related to the instant case. The prosecution dismissed the remaining charges.

Defendant took the witness stand in his own defense and denied any participation in the robberies. He admitted having known Thomas and said that up until the time of trial he had considered him a friend. He remembered the day of the robbery because it was his wife's birthday and he had decided to take her to Las Vegas. Although he was unemployed at the time, his wife did have a job. He testified that Thomas and his wife were invited to make the trip to Las Vegas but Thomas protested that he had no money for such a journey. Later, sometime between 12 and 1 o'clock, Thomas returned stating that he now had money.

The two couples drove to Las Vegas where defendant and his wife remained until the following night, leaving Thomas and his wife to return by bus. Defendant further testified that he felt compelled to return to be present at a garage sale to be held at his daughter-in-law's home as he planned to use the proceeds for a trip abroad. He also told the jury, somewhat inconsistently with the foregoing testimony, that he and his wife had moved out of their apartment across the hall from Thomas' apartment because defendant's wife had been diagnosed as having cancer and required hospitalization. Further, he stated that her last paycheck had been delayed and that they had no money for the rent.

Following defendant's conviction, he received a letter from Thomas which stated, in part: "The D.A. came to see me and offered me [my wife's] freedom in return for my testimony against you." Defendant thereupon moved for a new trial on the ground that the People had suppressed relevant evidence bearing on the credibility of Thomas. At a hearing on the motion for a new trial it developed that Mr. Norris, the deputy district attorney assigned to try the case when Thomas and defendant were charged as codefendants, had talked with Thomas after he had entered his plea of guilty. Thomas volunteered that he would be willing to testify against defendant if his (Thomas') wife, who had been convicted of robbery committed by her and her husband, would receive a lenient sentence. She had been preliminarily sentenced to the Department of Corrections for 90 days' evaluation pursuant to the provisions of Penal Code section 1203.03.

Deputy Norris discussed Mrs. Thomas' case with the trial deputy who was assigned to the court of the judge before whom Mrs. Thomas was later to be arraigned for sentencing. The trial deputy discussed the matter with the judge and thereafter related to Deputy Norris that in sentencing Mrs. Thomas the judge "would consider" Thomas' coopera-

tion. Deputy Norris relayed this assurance to Thomas in the presence of Deputy District Attorney Arnold Wiener, the deputy who, following Thomas' pleas of guilty, prosecuted defendant. Deputy Norris also informed Deputy Wiener independently of the meeting with Thomas, of the nature of the agreement struck with Thomas regarding his testimony against defendant. Although the alleged bargain was never characterized as a "promise" of leniency to Mrs. Thomas, Deputy Norris understood and apparently shared Thomas' belief that the so-called bargain was premised upon a "guarantee" that by agreeing to consider Thomas' cooperation the sentencing judge had thereby indicated that Thomas' wife, if incarcerated at all, would not receive a state prison term. In Deputy Norris' words: "Mr. Thomas agreed upon [hearing of the judge's willingness to consider his cooperation] to testify, and, in essence, what he has indicated here in court is probably the way he understood it; [the judge], by considering it, would certainly mean no State Prison."

In the light of the circumstances hereinabove described, defendant's principal argument at the hearing on his motion for a new trial was that Thomas had given perjured testimony at trial and that the prosecution had known the same to have been false. The trial court may well have correctly concluded that Thomas' testimony was not perjured. At the hearing on the new trial motion Thomas, a manifestly clever witness, was asked only if he had received special consideration with regard to his plea bargain and his own sentencing. Thomas aptly responded: "I was never even asked why did I testify. I was asked specifically was there leniency to me. I was asked specific questions about my own case. There was never—no specific question, 'Where [sic] you promised anything at all?' There was always a qualification on the question, and I answered the questions as they were asked. They were asked semantically. I answered them semantically."

Defendant's second ground for the granting of his motion for a new trial was the prosecutor's failure to apprise him or his counsel of the circumstances which elicited Thomas' testimony, so that adequate inquiry could have been made about these circumstances during cross-examination. It is the alleged misconduct of the prosecutor in this respect which defendant now raises on appeal. In addition to the prosecutor's passive failure to reveal the inducement for the testimony of the key prosecution witness, defendant relies on the prosecutor's

affirmative misrepresentation to the court, made in defendant's presence, that no promises had been made to the witness.[2]

## I

It is a common practice for law enforcement officers or prosecutors to offer certain inducements for the testimony of prosecution witnesses since this is often the only means of obtaining crucial evidence. **(1)** Yet, as we have often stated, the role of the district attorney is more than that of an advocate. "His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial. . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234]; see also *People* v. *Kiihoa* (1960) 53 Cal.2d 748, 753 [3 Cal.Rptr. 1, 349 P.2d 673]; *People* v. *Sheffield* (1930) 108 Cal.App. 721, 732 [293 P. 72].) The fundamental responsibility to present material evidence to the court includes a duty to disclose to the defense substantial material evidence favorable to the accused in appropriate cases. (*In re Ferguson, supra,* 5 Cal.3d 525, 532.) Unless the prosecutor is required to make such disclosures the adversary system of criminal justice would be reduced to one in which the determination of guilt or innocence may be controlled by the prosecuting attorney's tactical choice to suppress favorable evidence, or his negligent failure to disclose it, rather than by the well-informed decision of the finder of fact. When such conduct hinders the ascertainment of truth, restraints must be imposed to prevent the denial of a fair trial as guaranteed by the due process clause of the Fourteenth Amendment of the Constitution of the United States.

In *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], the court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.* at p. 87 [10 L.Ed.2d. at p. 218].) In *Ferguson* we imposed a stricter duty upon

---

[2]In the course of making an evidentiary ruling early in the trial, the following colloquy occurred between the prosecutor and the court:

"THE COURT: . . . I have to inherently distrust the statements of a coconspirator [Thomas], and it is too easy for him to fabricate, and so I am going to be very rebellious about letting you introduce that into this trial in view of the fact that he was arrested—was he granted immunity of some kind?

"MR. WIENER: No. There is no immunity. He is convicted, I think, of 10 counts. *There was no promise made to him.*

"THE COURT: Well, whatever it is, there is still an inherent danger in allowing a coconspirator to wrap up the case this way." (Italics added.)

prosecutors by requiring them to disclose substantial material evidence favorable to the accused without request. Furthermore, *Brady* and *Ferguson* indicate that either intentional or negligent prosecutorial suppression of substantial material evidence favorable to the accused denies to the defendant a fair trial and requires reversal. (*Brady* v. *Maryland, supra,* 373 U.S. 83, 87 [10 L.Ed.2d 215, 218]; *In re Ferguson, supra,* 5 Cal.3d 525, 533.)

Subsequent to *Brady* and *Ferguson,* the United States Supreme Court has reiterated the requirement that prosecutorial suppression of substantial material evidence favorable to the accused requires reversal, irrespective of the prosecutor's good or bad faith. (*Giglio* v. *United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 108, 92 S.Ct. 763].) *Giglio* involved the alleged denial of a fair trial when the prosecution failed to disclose to the jury an alleged promise of leniency to a key prosecution witness in exchange for his testimony. The court held that the failure to disclose to the jury or to the defense evidence of the alleged inducement, and the failure to correct misleading statements by the witness which implied that no inducement had been offered, denied the defendant a fair trial as the evidence thus suppressed by the prosecution related to the credibility of a key witness whose testimony may have been determinative of guilt or innocence. (*Id.* at p. 154 [31 L.Ed.2d at p. 108]; see also *Napue* v. *Illinois* (1959) 360 U.S. 264 [3 L.Ed.2d 1217, 79 S.Ct. 1173].) *Giglio* imposed upon the prosecution the duty to correct false or misleading testimony concerning inducements for incriminating testimony and the duty to disclose such inducements to the defense and to the jury.

■ We recognize the foregoing cases as establishing a duty on the part of the prosecution, even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused,* whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness. We next consider the effect on a judgment of conviction of a prosecutorial failure, whether intentional, negligent or inadvertent, to disclose such evidence when the same bears on the credibility of a material witness.

■ We note, preliminarily, that when the evidence which is suppressed or otherwise made unavailable to the defense by conduct attributable to the state bears directly on the question of guilt our initial inquiry is whether such conduct resulted in denial of a fair trial. If so, the

judgment of conviction must be reversed without weighing the degree of the prejudice to the accused. (*Pyle* v. *Kansas* (1942) 317 U.S. 213, 216 [87 L.Ed. 214, 216, 63 S.Ct. 177]; *People* v. *Kiihoa, supra,* 53 Cal.2d 748, 754; see also *In re Imbler* (1963) 60 Cal.2d 554, 567 [35 Cal.Rptr. 293, 387 P.2d 6], wherein we stated: "Moreover, suppression by the state of material evidence alone deprives a defendant of due process of law.") It is necessary in such circumstances, of course, that the materiality of the evidence suppressed or otherwise not disclosed be examined in order that we may judge whether an accused has been fairly tried, but that examination is one which goes to the question of the materiality of the evidence rather than prejudice to the accused.

As in the case of the suppression of evidence which bears directly on the question of an accused's guilt, the suppression of material evidence bearing on the question of the credibility of the key witness for the prosecution has also been cast in language of denial of a fair trial. Thus, in *In re Ferguson, supra,* 5 Cal.3d 525, we held that the case turned on the credibility of prosecution witnesses, a man and wife who claimed the accused had kidnapped and sexually assaulted the wife, and the credibility of the accused who claimed the prosecution witnesses had offered to prostitute the wife. The prosecutor suppressed evidence of the male complainant's prior criminal offenses, which included many of a sexual nature, and we "concluded that in the circumstances of the case the suppressed evidence must be deemed material and the suppression deprived petitioner of a fair trial." (*Id.* at p. 534.)

In *Napue* v. *Illinois, supra,* 360 U.S. 264, the Supreme Court held that a conviction obtained through the use of false evidence, although not solicited by the state, "must fall under the Fourteenth Amendment." (*Id.* at p. 269 [3 L.Ed.2d at p. 1221].) In commenting on the use of false testimony the court stated that the principle that the state may not make knowing use thereof "does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." (*Id.* at p. 269 [3 L.Ed.2d at p. 1221].) In *Giglio* v. *United States, supra,* 405 U.S. 150 as previously set forth, the only witness linking the accused to the crime was an alleged coconspirator, who testified for the prosecution. There, as in the instant case, promises of lenient treatment were made and not disclosed to the

accused. The United States Supreme Court held that such conduct on the part of the state did not comport with "due process requirements." (405 U.S. at p. 155 [31 L.Ed.2d at p. 109]; see also *People* v. *Hitch* (1974) 12 Cal.3d 641, 645-647 [117 Cal.Rptr. 9, 527 P.2d 361].)

Although the test has not been clearly spelled out it nevertheless appears that when the credibility of a key witness is at issue an accused is not entitled to the reversal of a judgment of conviction obtained by the suppression of material substantial evidence unless prejudice is demonstrated. In *Ferguson,* after concluding that the evidence was material and the accused denied a fair trial, we stated that it was "reasonably probable" that had the defense been aware of the suppressed evidence "it could have obtained a different verdict." (*In re Ferguson, supra,* 5 Cal.3d 525, 535.) In *Napue,* after stating that such a conviction "must fall under the Fourteenth Amendment," the United States Supreme Court held that its evaluation of the record "compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial. Accordingly, the judgment below must be *reversed."* (*Napue* v. *Illinois, supra,* 360 U.S. 264, 272 [3 L.Ed.2d 1217, 1223].) In *Giglio* the court stated: "We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict' . . . . A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' *Napue, supra,* at 271." (*Giglio* v. *United States, supra,* 405 U.S. 150, 154 [31 L.Ed.2d 104, 108].)

We conclude that the suppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process within the meaning of the Fourteenth Amendment. Although the denial is not one attributable to error by the court we nevertheless judge its prejudicial effect and whether defendant is entitled to relief therefrom in the same manner as in the case of federal constitutional denials resulting from error by the court. An accused, accordingly, is entitled to relief in such circumstances unless we can declare a belief that the denial "was harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) We read the language of *Napue* and *Giglio* as not placing a heavier burden on the state than that imposed by *Chapman,* and we elect in the interest of an evenhanded application of the law to follow the *Chapman* rule when confronted with

all denials of federal constitutional dimensions even if *Napue* and *Giglio* propose a less stringent rule.[3]

Our recognition of the constitutional underpinnings of the prosecution's duty to disclose substantial material evidence favorable to the defense, and the accompanying application of the *Chapman* reversible error test, does not establish a per se rule requiring reversal on any occasion when relevant evidence is not disclosed. The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt. The prosecution does not have to risk reversal simply because a complete accounting of all conceivably exculpatory evidence is not made. (*Moore* v. *Illinois* (1972) 408 U.S. 786, 795 [33 L.Ed.2d 706, 713, 92 S.Ct. 2562].)

## II

■ Our review of the record indicates that substantial material evidence which was favorable to defendant was improperly suppressed by the prosecution in the instant case. The deputy district attorney was aware of the inducement for Thomas' testimony; he was also aware that Thomas' testimony would be extremely damaging to defendant. Yet, the deputy either wilfully or through inadvertence not only failed to disclose details of the inducement for Thomas' testimony, but also forestalled further inquiry by affirmatively representing to the court that no

---

[3]In *People* v. *Wagner* (1975) 13 Cal.3d 612 [119 Cal.Rptr. 457, 532 P.2d 105], we applied the prejudicial error test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], in reversing a judgment of conviction on the ground of prosecutorial misconduct during cross-examination of the defendant. The question of the defendant's guilt in *Wagner* was dependent on the jury's assessment of his credibility, and we recognized that the defendant's credibility was clearly impaired by the manifestly improper cross-examination. In applying the *Watson* test we relied upon *People* v. *Perez* (1962) 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946] and *People* v. *Lyons* (1958) 50 Cal.2d 245, 262 [324 P.2d 556], which established the rule "that a miscarriage of justice [under *Watson* ] has occurred when the case is closely balanced and the acts of misconduct are such as to have contributed materially to the verdict. [Citations.]" (*People* v. *Wagner, supra,* 13 Cal.3d at p. 621.)

Although *Wagner* states the proper prejudicial error test when prosecutorial misconduct in the form of improper cross-examination is involved, it cannot control when, as in the instant case, the misconduct assumes federal constitutional dimensions in the form of intentional suppression of material evidence favorable to the accused. Moreover, prosecutorial misconduct occurring in open court is less likely to affect the outcome of the case in instances when the jury can be admonished not to draw unfavorable inferences from improper questioning. (See *People* v. *Wagner, supra,* 13 Cal.3d at p. 621.) When the prosecution suppresses evidence, the court and the defendant are powerless to remedy the misconduct through such admonitions.

promises had been made to Thomas. He thereby effectively foreclosed a crucial attack by the defense upon the credibility of the key prosecution witness. The only material evidence against defendant other than the testimony of Thomas was Mrs. Hannaford's identification. The identification, although reflecting Mrs. Hannaford's conscientious conclusion, indicated some uncertainty on her part.[4] It is also significant that Mr. Castillo, who had far more opportunities to observe the accomplice during the robberies, was unable to identify defendant as Thomas' accomplice. Thomas' testimony at the close of the prosecution's case, which if believed fully implicated defendant in the robberies, was wholly devastating. In the words of the trial judge, "Mr. Thomas' testimony certainly wrapped up the case so that there was little room for doubt as to whether or not [defendant] was guilty."

Defendant denied any participation in the robberies and presented an alibi defense which created a direct conflict in the evidence. In resolving the conflict, however, the jury was deprived of crucial evidence that Thomas had a motive to lie. Moreover, the record demonstrates that the jury had difficulty resolving the conflict. It deliberated for two and one-half days before returning the guilty verdicts. It is apparent that to this jury the case was closely balanced and the misconduct which forestalled effective impeachment of the key prosecution witness was critical. We cannot, accordingly, conclude that the constitutional denial was harmless beyond a reasonable doubt.

The judgment is reversed.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

[4]For a discussion of the dangers inherent in eyewitness identification, see Sobel, Eyewitness Identification: Legal and Practical Problems (1972) at pages 1-15.