[Crim. No. 15017. Fourth Dist., Div. One. Sept. 21, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY ROY SHAPARNIS, Defendant and Appellant.

**[Certified for partial publication.[1]]**

[1]Certified for publication with the exception of section III.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Victoria Sleeth, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael D. Wellington and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, J.**—Stanley Roy Shaparnis appeals the judgment in a second trial[2] entered on a jury verdict finding him guilty of first degree murder

---

[2]Shaparnis' first trial ended in a mistrial when the jury, 11 to 1 for conviction, was unable to reach a verdict.

(Pen. Code, §§ 187, 189)[3] with personal use of a firearm (§ 12022.5). Shaparnis also appeals several trial court orders, including an order denying his motion for a new trial (§ 1237, subd. (1)). We conclude the prosecutor's failure to disclose substantial material evidence favorable to Shaparnis requires reversal of the judgment.

I

On January 11, 1981, Paul (Pablo) Cruz was found at the Otay landfill murdered by a .16 gauge shotgun wound to the head and multiple stab wounds about his chest, back and neck. Cruz was allegedly enticed to the landfill by Shaparnis and Patrick Wilson on the pretext of participating in a drug rip-off to obtain heroin.

Shaparnis was initially questioned by police but was not held as a suspect. During questioning the police withheld pertinent details of the murder known only to the killer. The day after the killing Shaparnis showed his friend, Michael Brown, a newspaper article which reported the killing but did not identify the victim. Shaparnis told Brown the article was about Cruz. On one occasion Shaparnis told Brown he was going to take Cruz "out of the box," a slang expression on the streets for having someone killed. Shaparnis had Brown listen in on a telephone call he had with Cruz regarding a $5,000 drug rip-off and later told Brown Cruz had just been set up.

Two months after Cruz' murder Brown was caught redhanded in the midst of a burglary and arrested. As he had done on previous occasions, Brown offered police information in exchange for his freedom. He told police Shaparnis was responsible for Cruz' murder. Brown suggested the police, with his assistance, surreptitiously tape record conversations of Brown and Shaparnis in which Brown would elicit a confession from Shaparnis. The plan worked. Brown and the police rented adjoining motel rooms. A microphone was hidden in the draperies of Brown's room and the conversations were monitored by police in the other room. Brown and Shaparnis injected one-half gram and one-quarter gram of heroin, respectively, and shared one bottle of wine and a couple of twelve-ounce beers on the road en route to Brown's motel room. Once in the room the two started talking and Shaparnis told Brown how he and Wilson murdered Cruz, divulging details known only to the police and the killer. Shaparnis was arrested on the basis of Brown's accusations and the tape-recorded "confession."

The tape recording of Shaparnis' conversation with Brown played an important part in Shaparnis' conviction. A few sentences from that 45-minute

---

[3]All statutory references are to the Penal Code unless otherwise specified.

recording accurately describe the sordid environment in which the victim, Shaparnis and his criminal cohorts lived. "Pablo was gonna rat, man, he was makin' it look like I'm the one who stole the TV. . . . He threatened to rat out on me. . . . The only good rat is a dead rat. That's the way I feel, and that's the way I'll always feel. Somebody rats on, or rat finks . . . [I'll] take 'em outa the box."

Shaparnis explained away the recording by testifying it only reflected his personality. He had the tendency to make up tall tales for Brown's eager consumption, boasting of many things which he had never actually done. Shaparnis also explained he knew Cruz' killer and gained his intimate knowledge of the crime from the killer, not through his own participation. Shaparnis, however, refused to identify the murderer. At trial Shaparnis and Wilson produced the same alibi witnesses for the crucial time period. In essence, Shaparnis' and Wilson's alibi defense, that they were home watching a football game on television, was pitted against what Shaparnis had told Brown and the tape recorded confession.

## II

■ Shaparnis argues his conviction must be reversed because of several prejudicial evidentiary errors, including the court's admission of the tape recording and exclusion of the testimony of an expert witness, and the prosecutor's suppression of substantial material evidence favorable to him. The last argument has merit.

In *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], the United States Supreme Court held ". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.*, at p. 87 [10 L.Ed.2d at p. 218].) ■ The California Supreme Court in *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234] imposed a stricter duty upon prosecutors by requiring them to disclose substantial material evidence favorable to the accused without request. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 405-406 [121 Cal.Rptr. 261, 534 P.2d 1341].) When the evidence bears on the credibility of a key prosecution witness, a defendant must show the evidence was substantial, material and favorable to him. ■ A defendant need not show prejudice under *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Instead, once substantial materiality is shown, the judgment must be reversed unless the People establish the failure to disclose the evidence was harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra,* 14 Cal.3d at pp. 408-409.) ■ In the context of this case substantial material evidence requiring reversal means "evi-

dence of such significance that with reasonable probability it could have affected the outcome of the trial" or "might have caused a different verdict." (*In re Wright* (1978) 78 Cal.App.3d 788, 811-813, fns. 8-11 and accompanying text at pp. 811-814 [144 Cal.Rptr. 535].)

With these rules in mind, we consider Shaparnis' argument at his new trial motion including his reference to the information contained in the June 1, 1981, supplemental police report prepared by Detective Mark Croshier which was not made available to Shaparnis' counsel.

Shaparnis' new trial motion was based in part upon the prosecutor's failure to disclose the true name, address and telephone number of a key witness interviewed by the police. James B. Burns was Shaparnis' lawyer in his first trial. According to local practice, without a formal discovery motion the deputy district attorney Revak simply opened his file to counsel, allowing him to review and photocopy any and all documents. The material Burns obtained consisted of a 30-page report prepared by Croshier on March 24, 1981, and a patrol bulletin issued by Croshier on January 20, 1981. From the report Burns learned about a man identified as Jay Potts.

The morning after the murder Croshier talked to Pablo's brother William about Pablo's associates. Cruz told him Pablo had recently met a man named Jay who supposedly had a lot of connections in Mexico. Mary Hurt, Pablo's sister, told Croshier the man's name was Jay Potts and Pablo had recently talked of "doing a deal" with him. Potts was described as a white male, 29-30 years old, having medium blond hair and blue eyes, about 5 feet 9 inches tall, 160 pounds, fluent in Spanish.

On January 13, 1981, Hurt reported to Croshier that Potts had come to her house. When she informed Potts she had told the police about him he said it did not matter because she did not know his real name. Potts seemed nervous and Hurt thought he had a gun because he kept his hand in his pocket and kept checking the surroundings. Potts told her Pablo's killers were with the Mexican Mafia. Pablo and "another guy," not Potts, met with the men to pull a drug rip-off on them but the killers had figured out what Pablo was doing "and killed him right there, Pablo started to run, and they shot him, and the little one was weaker and they kept him." According to the report, Potts' reference to "the little one" probably meant Jesus Espinoza who was murdered about the same time as Cruz but found in a different area of town. Potts told Hurt she should move away because they would get her too. From his behavior, however, Hurt wondered if she should be afraid of Potts and perhaps it was Potts who had helped kill her brother.

On January 14, 1981, Croshier made efforts to identify Potts, checking back with Hurt for further information. On the 16th, Detective Woolf told Croshier other associates of Cruz had confirmed Potts' description and were able to add to it certain tattoos and confirm the description of Potts' automobile. The next day Croshier received a telephone call from Potts who denied involvement in the drug rip-off and denied having anything to do with the two murders. At that time, Croshier was unable to arrange a satisfactory appointment to meet Potts.

Later, on April 23, 1981, Croshier met with Potts, learned his true name to be Wyne Jay Potter and received his birthdate, social security number, home address and telephone number and the name, address and telephone number of his employer. Potter again denied involvement in Cruz' murder. Potter told Croshier that on Thursday or Friday before Pablo was killed, Pablo had made a telephone call to Shaparnis to discuss a "big dope deal." Cruz and Shaparnis had also discussed some money Shaparnis owed Cruz from the sale of some stolen fencing. According to Potter, Cruz had discussed the big dope deal with Potter and asked if he wanted in on it before he called Shaparnis. Potter declined. Potter gave Croshier an alibi for Saturday, January 11, 1981, explaining he was watching football at a friend's house. Potter was wearing a hat similar to the one frequently worn by Pablo. Croshier remembered Hurt had mentioned Potter had been wearing Pablo's hat when he visited her the day after the murder. Potter told Croshier Pablo had left the hat in Potter's car a few days before the murder. Croshier accepted the hat and it was logged into evidence. Potter told Croshier he "would make himself available in any future court proceedings."

The information which Croshier received from Potter at their April 23 meeting was written up in Croshier's June 1, 1981, supplemental report. That report was given to the prosecutor the same day it was prepared or shortly afterward. The report also included information about a man named Tobias John Bye. On May 7, 1981, detectives learned Bye possessed the shotgun used to kill Pablo. Detectives searched his home but were unable to find the shotgun. Bye told them he had gotten rid of it a couple nights before but refused to identify the person from whom he received the gun or what the involvement of that person had been. On June 1, 1981, Croshier asked Brown about Bye. Brown said Bye was the person who had sold heroin to Shaparnis on the date of the taped confession.

James Burns, Shaparnis' first trial counsel, did not receive Croshier's June 1 report and had no knowledge of its contents. From Croshier's earlier report Burns concluded "Potts" was an important witness. The private in-

vestigator Burns hired was unsuccessful in his efforts to locate Potts. Burns knew nothing about Bye. James W. Tetley was Shaparnis' lawyer in the second trial. He made no formal discovery motion but was furnished all the discovery from Burns. In addition, Tetley received some additional material from the prosecutor but not the June 1 report. Tetley also hired an investigator to locate Potts but was unsuccessful. It was not until Brent O'Malley Barnes became Shaparnis' counsel for the new trial motion that the missing report was located. Barnes compared discovery he had received from Burns and Tetley with the material in Revak's file. He did not see the June 1 report in the file but in talking to a number of witnesses he found out Potts was also known as Potter. Barnes then talked to Croshier who seemed surprised that Barnes did not know about his meeting with Potter and explained it was "all in the reports." The prosecutor produced the June 1 report at the hearing on the motion for new trial, claiming it had been in his file all along. Apparently the prosecutor's file had disappeared for several weeks before the motion for new trial but was located the morning of the hearing. The trial court found the supplemental report had not been received by defense counsel but denied the motion, finding the material was neither substantial nor exculpatory and determining that it would not have any effect upon a jury in any retrial.

Croshier's supplemental report, however, includes among other things the correct name, birthdate, social security number and the whereabouts of a witness, Potter, who had given both Croshier and Hurt reason to believe he knew who had killed Cruz. The contents of the January 20 patrol bulletin indicate Croshier suspected Potter might even have been an eyewitness to Cruz' murder. Moreover, Potter's statement to Hurt that Cruz' killers were with the Mexican Mafia suggests Shaparnis was not one of the killers. Burns and Tetley, each believing that Potter was a key witness, unsuccessfully attempted to locate him using the incorrect name appearing in an earlier police report. Had Burns and Tetley received Croshier's supplemental report they would have learned of Potter's whereabouts and of his willingness to be "available" in future court proceedings. Had Potter testified, Shaparnis' alibi defense probably would have been enhanced because of the reasonable inference the jury could draw that someone other than Shaparnis had murdered Pablo. In these circumstances, we conclude it is reasonably probable the information in Croshier's supplemental report could have affected the outcome of the trial and thus was substantial material evidence favorable to Shaparnis. (*In re Ferguson, supra,* 5 Cal.3d at pp. 533, 535; *In re Wright, supra,* 78 Cal.App.3d at pp. 811-814.) We also conclude the People have not established the failure to disclose that information was harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra,* 14 Cal.3d at pp. 408-409.) The judgment must be reversed.

### III*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### *Disposition*

Judgment reversed.

Brown (Gerald), P. J., and Butler, J., concurred.

A petition for a rehearing was denied October 12, 1983.

---

*See footnote 1, *ante,* page 190.