Filed 1/6/14  P. v. Bossett CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH BOSSETT,<br><br>      Defendant and Appellant. | A136134<br><br>(Contra Costa County<br>Super. Ct. No. 51003706) |

On October 10, 2009, Joseph Bossett fired two shots that struck and wounded Rafael Nolen.  Bossett also fired in the direction of Elester Shelton, who approached Nolen after he had been shot.  Bossett claimed that the shooting of Nolen was in self-defense because Nolen had displayed a gun and threatened to shoot him for being an informer.  None of the witnesses saw Nolen with a gun, and no gun was found near him. A jury convicted Bossett on counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd (a))[1] and assault with a deadly weapon (§ 245, subd. (a)(2)).

On appeal, Bossett seeks reversal of his convictions, arguing that the prosecution failed to disclose material, exculpatory evidence to the defense, in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  We reject Bossett's argument because the evidence at issue was not material to Bossett's defense.

Bossett also seeks amendment of the abstract of judgment to reflect the fact that his sentence for assault with a deadly weapon was to be served concurrently with his

---

[1] All statutory references are to the Penal Code, unless indicated otherwise.

sentence for attempted murder. The People agree that the court clearly stated at the sentencing hearing that the two sentences were to be served concurrently and that the abstract of judgment fails to reflect that fact. Accordingly, we order that the abstract of judgment be amended to state that the sentences are to be served concurrently.

## BACKGROUND

### I. *Procedural Background*

On April 16, 2010, the People filed an information charging Bossett with one count of premeditated attempted murder (§§ 187, subd. (a), 664, subd (a)) (count one) and one count of assault with a deadly weapon (§ 245, subd. (a)(2)) (count two). Count one was accompanied by the allegation that Bossett intentionally used a firearm in committing the offense. (§ 12022.53, subds. (b), (c), (d).) Count two was accompanied by the allegation that Bossett personally used a firearm in committing the offense. (§ 12022.5, subd. (a)(1).) The information further alleged that: (1) Bossett had a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) for attempted voluntary manslaughter (§§ 192, subd. (a), 664); (2) Bossett had a second prior strike conviction for burglary (§§ 459, 460, subd. (a)); and (3) pursuant to section 667, subdivision (a)(1), Bossett's prior voluntary manslaughter conviction was a serious felony.

A jury trial commenced on April 19, 2011. On April 29, the jury returned a verdict, convicting Bossett on both counts and finding the firearm allegations to be true. The jury was unable to reach a verdict on the question of premeditation.

On June 15, 2012, the court sentenced Bossett to a term of 67 years to life. The aggregate term on count one was 67 years to life. The aggregate term on count two was 34 years to life, to be served concurrently with the sentence for count one.

On June 22, 2012, Bossett filed a timely notice of appeal.

### II. *Factual Background*

Bossett was a close family friend of Nolen and his wife. On an almost daily basis, he would provide transportation for Nolen and his family.

Shelton was Nolen's cousin and he and Nolen saw each other daily until the shooting. Shelton and Nolen frequented the apartment building at 224 Ohio Avenue in

Richmond, California where their friend, Mary Carrier, lived in apartment one and Carrier's boyfriend, Larry Parker, lived in apartment two. A third apartment was also rented by Parker, who would sublet it on a short term basis, sometimes to Nolen and Shelton. Nolen and Shelton spent so much time at this apartment building that they called it their office. Although no one would testify to dealing drugs at the apartment building, Shelton admitted to police that he and Bossett bought and sold small amounts of narcotics on occasion.

Bossett lived within a block of the apartment building, at 308 Ohio Avenue. He worked for the landlord of the apartment building, assisting with the maintenance of the landlord's rental properties. Bossett drove a white pickup truck that was owned by the landlord.

Two to two and a half months before the shooting, Bossett loaned some money to Nolen. Shelton said that Bossett was "always coming over" and asking Nolen for money. Shelton saw Bossett become upset about the money after Nolen would "blow him off." Nolen's wife testified that for the week or two before the shooting, Bossett called their house five or six times a day about the money and would show up at their door, unannounced, asking to see Nolen and complaining that Nolen had not repaid him. Bossett denied calling the Nolen residence or showing up unannounced to ask for his money.

Prior to the shooting, Shelton came to believe that Bossett might be a police informant. Shelton thought that Bossett asked questions that he shouldn't have asked. He also thought that the fact that the police "raided" 224 Ohio Avenue a few days before the shooting was suspicious.[2] Shelton had discussed his concerns about Bossett with Nolen.

---

[2] No independent evidence was presented concerning a police action at 224 Ohio Avenue.

Bossett's counsel also questioned Shelton concerning the detention of Parker for possession of a pipe, along with a woman who had "bags of rocks," within a week of the shooting. However, Shelton did not state that Parker's detention was a reason for suspecting Bossett to be an informant.

On October 10, 2009, Bossett was cleaning up the grounds at 224 Ohio Avenue, loading garbage and debris into his truck. According to Bossett, Parker assisted Bossett in moving a recliner chair onto the truck and Bossett found a box containing a ".25 automatic pistol" jammed between the seat and arm of the chair. Bossett put the pistol in his pocket so that Parker would not take it.

Later in the day, Bossett knocked at the door of 224 Ohio Avenue to get a key from Parker. Bossett testified that after Parker let him in, Nolen ran up to him and started "yelling and screaming at [him] about being a snitch." According to Bossett, Nolen told him that he "was going to blow [his] face off if [he] didn't stay [out] of [Nolen's] business." Bossett stated that he was afraid, backed away, and left the property when Carrier asked him to. Shelton testified that he heard about an argument between Nolen and Bossett at Carrier's residence.

Bossett parked his truck in front of his own home and saw Shelton walk up to 224 Ohio Avenue. According to Shelton, Nolen told Shelton that he wanted to talk and they agreed to meet at a nearby bike trail. Shelton knew they would be meeting to discuss Bossett. Bossett testified that after leaving 224 Ohio Avenue, Shelton walked past his truck and pointed his finger at Bossett, holding his hand out as if it were a firearm.

Bossett then saw Nolen come out of 224 Ohio Avenue. Bossett started his truck and moved in behind Nolen "to catch him and talk to him." Bossett testified that he wanted to let Nolen know that eviction papers were to be served at 224 Ohio Avenue and that Nolen's car would be towed if not removed from the property. He did not want Nolen to think that he had anything to do with the towing of Nolen's car.

Bossett parked his truck on Second Street. Nolen was about 30 feet into a parking lot that adjoined the bike trail. Bossett yelled to Nolen that he wanted to talk and, according to Bossett, Nolen turned around and yelled "you mother fucker" at him. Bossett said that he tried to make Nolen understand that his car would be towed, but Nolen replied, "I told you to stay out my God damn business, and that I was going to blow your fucking head off." Bossett testified that Nolen then started running toward him.

4

Bossett stated that after turning to face him, Nolen put his left hand underneath his jacket into the waistband of his pants. Nolen then had an object in his hand, and, as he ran toward Bossett, he made a gesture as if trying to put a bullet into the chamber of a pistol. Bossett was frightened and pulled out the .25 caliber pistol that he had earlier put into his pocket. Bossett fired when Nolen was five or six feet away. After the first shot, Nolen lunged toward him, and Bossett fired a second shot. There was barely one second between the shots.

Bossett stated that Shelton ran toward a grassy area where there was a ditch. Shelton seemed to be reaching for an object on the ground and Bossett fired two shots to make him desist. These were warning shots and he did not attempt to hit Shelton. Bossett then went to his truck and drove away.

Shelton testified that after Bossett called Nolen's name, Nolen turned around to talk to Bossett. Nolen and Bossett were talking, not yelling, and Shelton could not hear what they were saying. However, immediately before the shooting, Shelton heard Bossett asking, "You going to have somebody kill me?" Nolen then made a gesture with his hand, putting it up at shoulder height with open palm, then swatting down to his upper leg. To Shelton, this gesture meant "man get out of here with that" or "go somewhere." Shelton could see both of Nolen's hands, neither of which was in a pocket. Nolen had no weapon. Bossett fired and Shelton saw Nolen step back, and then step forward again. Bossett fired a second shot and Nolen fell face first onto the ground. Shelton ran to help Nolen, but turned and ran away when Bossett pointed the gun at him. He heard Bossett fire at him, but the shot hit a wall.

Kimberly Palacios was in the parking lot and witnessed the events. She saw Nolen and Bossett arguing, both with raised voices, for two or three minutes. She saw Bossett take a gun from his pocket and point it at Nolen, who put his hands up with his fingers open in front of his chest. Bossett fired twice and Nolen fell down. Palacios never saw a weapon in Nolen's hands or in the area around him. She did not see Nolen lunge in Bossett's direction. When Shelton ran up, Bossett tried to shoot him as well.

5

Madelin Valera also witnessed the events. She saw Bossett and Nolen arguing and she saw Bossett produce a gun and start shooting. She stated that Nolen had not used a gun and had not produced any weapons. Nolen did not reach into his pockets or make fists with his hands. Nolen's hands were down at his sides and she did not see Nolen threaten or run toward Bossett. She did not see Nolen make any physical threats toward Bossett after the first shot. She did not see Nolen lunge in Bossett's direction. When Shelton approached, Bossett tried to shoot him two or three times.

Marc Fabiani was the first police officer on the scene. He found no firearm on the ground around Nolen. When Nolen was taken to the hospital, it was determined that he had two gunshot wounds to the head, the bullets remaining inside his body. The initial prognosis was that Nolen would not survive his injuries. Nolen did survive, but he had no recollection of the events of October 10, 2009.

## DISCUSSION

### I. *Alleged* **Brady** *Violation*

### A. *Background*

Prior to trial, Bossett requested in writing: (1) all documents related to criminal activity at 224 Ohio Avenue from January 1, 2009 to October 31, 2009, involving Parker, Shelton, and Nolen and (2) all documents concerning a raid at Parker's residence that occurred a week prior to the shooting. Bossett also orally requested documentation concerning the arrest of Jermaine Foster, Nolen's brother, about a week before the shooting. The People stated that there were no documents responsive to the requests.

After the jury returned its verdict, the probation department determined that Foster had been arrested on a parole warrant on October 2, 2009. On September 2, 2011, the People produced a dispatch log from the Richmond Police Department that related Foster's arrest, but no police report had been generated. The log indicates that Foster was arrested because of an outstanding warrant related to a parole violation.

The People later produced a police report documenting the detention of Parker in the driveway of 224 Ohio Avenue at 1:24 p.m. on October 2, 2009. The report stated that an officer approached a vehicle after it had entered the driveway of 224 Ohio Avenue

6

because it had made turns without using a turn signal and had an expired license plate registration tab. There were three people in the vehicle and Parker was a front seat passenger. After a crack pipe was discovered in the vehicle, Parker consented to a search of his person, but the police found no contraband. Because the traffic stop was at Parker's residence, Parker was allowed to leave. A scale and a small amount of cocaine base were also found in the car and the driver was arrested. A female passenger in the vehicle was also questioned.

Bossett moved for a new trial, alleging a *Brady* violation. In their opposition to Bossett's motion, and at the hearing, the People conceded that the material had not been produced for the defense in response to the discovery request. Although a call had been made to the Richmond Police Department for the records, nothing was provided.

After arguments of counsel at the hearing on Bossett's motion for a new trial, the court reviewed the evidence contained in the police dispatch log and report. The court then stated: "Those are the reports that we have. So knowing about those incidents, assuming the parties knew about those incidents, would they create in the mind of the parties [a belief that Bossett] was a snitch and out to get them." The court acknowledged that it was clear that Shelton thought Bossett was a snitch, but regarded Shelton's testimony as far more helpful to the defense than the police log and report at issue. The court believed that, rather than bolstering Shelton's testimony, the logs and report would have "taken away from it" because they provided no reason to believe that Bossett was behind the actions taken by the police. The court concluded: "I just don't believe that [the log and report] are material or helpful. [¶] I don't believe because of those reports this jury would have done anything different."

## B. *Legal Standard*

In *Brady* "the United States Supreme Court held that a defendant's right to due process is violated when 'favorable' evidence that has been 'suppressed' by the prosecution is 'material' to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested." (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1312.) *Brady* and other federal

7

precedent establish "a duty on the part of the prosecution, even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness." (*People v. Ruthford* (1975) 14 Cal.3d 399, 406, overruled on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 545-546, fn. 7.)

"Evidence is 'material' [under *Brady*] 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian*, *supra*, 9 Cal.4th at p. 544.) "The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt. The prosecution does not have to risk reversal simply because a complete accounting of all conceivably exculpatory evidence is not made." (*People v. Ruthford*, *supra*, 14 Cal.3d at p. 409.)

We review the elements of a *Brady* claim de novo. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

**C. *Materiality***

Bossett asserts that the arrest of Foster and the brief detention of Parker were material to a claim of imperfect self-defense because they related to the reasonableness of his belief that he faced an imminent threat from Nolen. Bossett argues that Foster's arrest and Parker's detention could have contributed to the degree of Nolen's anger, which "is important because it provides insight into how threatening his conversation with [Bossett] about snitching inside [224 Ohio Avenue] might reasonably have appeared to [Bossett]."

We are not persuaded by Bossett's argument. That Nolen was angry with Bossett was well established by the evidence at trial. However, Bossett did not testify that he feared imminent danger to his life because Nolen was very angry with him, but because he believed that the angry Nolen was running toward him with a gun in his hand.

8

Moreover, Foster was arrested because of an outstanding warrant and Parker was only briefly detained after a traffic stop. Nothing in the police log and report would provide a reasonable basis for the jury to conclude that Nolen blamed Bossett for these police actions and that these police actions contributed to Nolen's level of anger toward Bossett.

Shelton was forthcoming in his testimony concerning why he believed Bossett to be a police informant, yet he did not mention Foster's arrest as a basis for his belief. Defense counsel questioned Shelton about Parker's detention, yet Shelton did not say that this was a further basis for suspecting Bossett to be an informant. Shelton explicitly stated that he did not know why Parker had been detained, and seemed to dismiss it with the observation that anyone might be "caught with a piece of coke." Even if Shelton had regarded the Parker incident as a reason to suspect Bossett, the actual police report would have detracted from Shelton's account, showing that Parker was simply detained for a brief period and then released, while Shelton's testimony suggested that Parker had actually been arrested for possession of a pipe.

Anticipating our conclusion, Bossett argues that "[p]eople living on the edge of the law do not necessarily assess the cause of such actions [as the arrest of Foster and the detention of Parker] with the cool dispassion of a judge. Fearing snitches, they may conclude, reasonably in their own minds, that the increased police presence in the area was due to [Bossett's] snitching to the police." Speculation that Nolen may have unreasonably suspected Bossett to have been behind Foster's arrest and Parker's detention does not establish a reasonable basis for a jury to infer that Nolen actually did so. Even less does it work to establish that Nolen's anger so clouded Bossett's perception that Bossett saw a gun where none, in fact, existed.

We conclude that the police log and report at issue were not material to Bossett's defense and no *Brady* violation occurred.[3]

_____

[3] Bossett also argues, "[f]or essentially the same reasons," that the police logs and report were material to an assertion of self-defense on the charge that he assaulted

**II.** *The Abstract of Judgment*

The aggregate sentence imposed by the court on count two was 34 years to life. At the sentencing hearing, the court stated that the sentence for count two was to be served concurrently with the sentence for count one, but the abstract of judgment does not reflect that determination. Bossett requests that the abstract of judgment for count two be modified to reflect that the sentences for counts one and two were imposed as concurrent terms. The People concur that the abstract of judgment should be so modified.

"An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment . . . ." (*People v Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we order the trial court to amend the abstract of judgment.

## DISPOSITION

We order the trial court to amend the abstract of judgment to state that the sentence on count two is to be served concurrently with the sentence on count one. The judgment is affirmed in all other respects.

---

Shelton with a deadly weapon. The argument fails for the same reasons that it fails on the charge of attempted murder.

_____
Brick, J.*

We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.