Filed 10/31/13  P. v. Belardo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>WILBERTO BELARDO,<br><br>     Defendant and Appellant. | A133128<br><br>(Solano County Super. Ct.<br> No. FCR260088) |

Wilberto Belardo appeals from his conviction for the 1998 murder (Pen. Code, § 187) [1] of Jose Zarate and the special circumstance finding that Belardo committed the murder during the commission of a robbery (§ 192.2, subd. (a)(17)(A)).  Belardo asserts the following errors:  (1) the trial court failed to obtain a separate waiver of trial by jury on the special circumstance allegation; (2) the trial court should not have admitted the testimony of two witnesses, because that testimony was uncorroborated and the witnesses were liable for prosecution of the murder of Zarate; (3) insufficient evidence established his identity as the shooter in the Zarate homicide; (4) the People failed to inform the defense of material, exculpatory evidence in a timely manner, depriving him of a fair trial (a *Brady* violation); (5) the trial court erred in denying a mistrial because of the *Brady* violation; (6) because he was brought to trial in 2011 for a crime that occurred in 1998, he was prejudiced by the delay in prosecution; (7) because of the alleged *Brady* violation, his waiver of trial by jury on the issue of guilt was neither knowing nor intelligent; and

---

[1]  Unless otherwise indicated, all statutory citations are to the Penal Code

1

(8) the trial court erred in denying him a new trial because of new evidence discovered after trial.

We conclude that the trial court erred in failing to obtain a separate waiver of trial by jury on the special circumstance allegation, but we also conclude that the error was harmless. Finding no merit in Belardo's other assertions of error, the judgment and orders of the trial court are affirmed.

## BACKGROUND

This criminal case involves the February 15, 1998 murder of Zarate, during the commission of a robbery. Although the Zarate homicide occurred in 1998, charges were not brought against Belardo until 2010 because witnesses were not as forthcoming with investigators in 1998 as they would prove to be 10 years later. Alvaro Delatorre was present during the events and one of the perpetrators assaulted him, but he was unable to provide a certain identification of Belardo as the person who shot Zarate. Belardo's half brother, David Bango, and his girlfriend at the time of the murder, Melony Ellis, testified about admissions that Belardo made to them after the murder. Their testimony was the primary evidence for the prosecution.

## I. *Procedural Background*

The People filed an information on May 10, 2010,[2] charging Belardo with the murder of Zarate (§ 187), with personal discharge of a firearm causing death (§ 12022.53, subd. (d)), personal discharge of a firearm (§ 12022.53, subd. (c)), and personal use of a firearm (§ 12022.53, subd. (b)). The information also alleged the special circumstance that Belardo committed the murder while engaged in the commission of a robbery.[3] (§ 190.2, subd. (a)(17)(A).) Belardo pleaded not guilty and denied the sentencing enhancements.

---

[2] The information was amended on August 31, 2010, to correct a typographical error.

[3] The information also charged Belardo with the assault of Delatorre with a firearm, but that count was dismissed "per statute of limitations."

2

After the court and parties had settled several in limine motions, Belardo's counsel announced a willingness to waive trial by jury. The district attorney checked with her office, a brief voir dire followed, and trial by jury was deemed waived.

The trial commenced on April 27, 2011. The prosecution presented 21 witnesses, including Delatorre, Bango and Ellis. During the trial, additional information regarding the Zarate murder investigation was identified and turned over to the defense, leading to several mistrial and dismissal motions.

On May 12, 2011, the court found Belardo guilty of first degree murder (§ 187, subd. (a)) during a robbery (§ 190.2, subd. (a)(17)(A)). The court also found true the section 12022.53, subdivisions (b), (c), and (d) enhancements.

On August 18, 2011, the court heard and denied Belardo's motion for a new trial, based upon alleged *Brady* violations, newly discovered evidence, and insufficient evidence. The court sentenced Belardo to life in prison without parole for the murder during a robbery (§ 187, subd. (a); § 190.2, subd. (a)(17)(A)), plus 25 years to life in prison for personal discharge of a firearm causing death (§ 12022.53, subd. (d)).

Belardo filed a timely notice of appeal on August 24, 2011.

## II. *Factual Background* [4]

In February 1998, Zarate lived alone in a small trailer, from which he sold drugs, at the corner of Jackson and Cherry Streets in Dixon, California. Across the street from Zarate's trailer, about 20 to 25 feet away, Charlie Moore lived in a four-unit building. Belardo lived in Dixon with his mother, Norma Rivera; his stepfather; his girlfriend, Ellis; and his 15-year-old half brother, Bango.

### A. *The Homicide and Delatorre's Identification Efforts*

On February 15, 1998, Alvaro Delatore was visiting Zarate, his friend, while Moore hosted a barbecue party across the street. About 9:00 p.m., there was a knock at

---

[4] Pursuant to the applicable standard of review, discussed below, we state the facts in the light most favorable to the prosecution as the prevailing party. (*People v. Zamudio* (2008) 43 Cal.4th 327, 342, although we take note of certain inconsistencies among the prosecution's witnesses.)

the door of Zarate's trailer.[5]  The visitor gave a name that Delatorre did not remember and Zarate said it was okay to open the door.  Delatorre saw a man pointing a revolver at them, accompanied by another man wearing what might have been a nylon stocking over his face.  The man with the gun said, "This is a robbery.  Give us the money, the jewelry, and the dope."  The man then hit Delatorre on the top of his head with the gun, cutting his scalp and leaving him dizzy and dazed.  One of the men reached around Delatorre's neck and grabbed jewelry.  Delatorre took out his wallet and the gunman took it from his hand.

The gunman repeated his demand for money, dope, and jewelry and Zarate said, "I ain't giving nothing up."  Delatorre heard multiple gunshots and saw that Zarate had been hit.  After telling Delatorre to keep quiet, the two men left.  According to Delatorre, Zarate had methamphetamine and $1,500 on his person before the robbery.  When Zarate's body was later examined, the drugs and cash were gone.

Delatorre ran to Moore's house, where the party was still in progress, and reported the incident to the 911 operator.  He went back to the trailer and the police arrived a short time later.  Zarate was still alive when police arrived, but was unable to communicate.  His shirt had been removed and he was bleeding heavily from a bullet wound in the center of the chest.  Paramedics removed Zarate from the trailer, but he died at the scene.

When police interviewed him, Delatorre described the gunman as a "Black male around five foot six" with "a muscular build," "round face," and "puffy cheeks and short hair."  Delatorre thought the second man was also African-American, based on seeing his hands and arms.  During a pretrial conditional examination, held in anticipation of Delatorre's imminent deportation, he described the gunman as clean shaven, with no acne on his face, no visible tattoos,[6] and wearing a tank top.  He told the police that the revolver was chrome colored.

---

[5]  Delatorre testified that the knock came at 8:00 p.m. or shortly thereafter.  Other witnesses, however, placed the subsequent events at or after 9:00 p.m.

[6]  Belardo's sister testified for the defense that Belardo had gang tattoos between his fingers and on the back of his arm before February 15, 1998; Delatorre testified that he did not see the back of the gunman's arms and was not looking for tattoos when the man held the gun to his head.

4

Search of the trailer revealed a bloody shirt with a bullet hole on the bed with a spent bullet underneath it.  A ballistics expert testified that the bullet was .38 caliber, typically fired from a .38 special ammunition revolver.  No spent casings were found.

Zarate had a bullet entry wound in the chest and an exit wound in his back.  He also had separate entry and exit wounds in his left arm.

At trial, Delatorre testified that the gunman looked like one of two persons he had seen watching him and Zarate from Moore's party that night.  He said that he had seen the gunman "driving around" in a black convertible Mustang about a week before the shooting.  The People also presented testimony from a number of witnesses indicating that Belardo's stepbrother, Greg Felix,[7] drove a Mustang convertible and that Belardo rode in the car with Felix.[8]

When Delatorre testified at the conditional hearing, he identified Belardo as the gunman, but he was "not a hundred percent sure."  Belardo was wearing "jail clothes" and was in shackles at that hearing.  At trial, Delatorre again identified Belardo as one of the two men who entered Zarate's trailer.  He was about 50 percent sure.

However, on the night of the homicide, Delatorre assisted in the preparation of a computer-generated composite of the suspect.[9]  As the investigation progressed, he viewed several photographic lineups that included Belardo, but he told the police that he did not recognize anyone as the assailant.  On February 23, Delatorre viewed a live lineup including Belardo, but did not identify him.  The investigators told Delatorre that the shooter was in the live lineup, and when he said he did not recognize anyone, they told him, "Yes, he is.  He's there.  Pick him out."  Delatorre felt he was being pushed into

---

[7] Some witnesses identified Felix as Belardo's "brother."  Bango identified Belardo as his "half brother" and Felix as his "stepbrother."

[8] When Delatorre was interviewed by the police in 1998 he repeatedly said that he had not seen the gunman before the incident.  He said that he had not looked at the people across the street or paid any attention to them.  It was only when he was contacted by law enforcement again in 2008 that he mentioned seeing the gunman in a Mustang the week before the shooting.

[9] This composite of the shooter was "lost" by the time of trial.

picking somebody. He then selected someone other than Belardo from the live lineup and told the investigators he was 90 percent sure.

## B. *Belardo's Parole Violation and Account to Police*

Belardo was on parole from the California Youth Authority on February 15, 1998, and was subject to electronic monitoring, with a curfew of 10:00 p.m. He subsequently admitted a parole violation because electronic monitoring showed that he was not in his residence until 10:08 p.m. on February 15, 1998. He told police that he was at Moore's house between 7:00 and 9:00 p.m. and then walked home, a distance of about half a mile.[10] He said that when he got home he played with the dog in the back yard and denied possessing a gun.

The police searched Belardo's residence on February 17, 1998 and found no evidence connecting him to the robbery and homicide.

## C. *Events at Moore's Party*

Belardo, Bango, Felix, and Belardo's long-time friend, Dustin Blaylock, attended Moore's barbecue. They congregated in the carport area, from which Zarate's trailer was visible. Moore's girlfriend, Lea Mitchell, testified that at some point she overheard a conversation about "jacking" someone. She did not know who made the statement.

Bango was in the carport watching Belardo and Blaylock play craps when Belardo showed Bango a .38 revolver, which he held under a towel. Bango asked why he had a gun, and Belardo responded, "In case something happens. In case something pops off." Later that afternoon, Belardo asked Bango to hold the gun and then left the carport. Belardo returned within five minutes and took the gun back. Bango never saw the gun again and he left the party about 5:00 p.m. to meet friends.

In the evening, Belardo and Blaylock left the party and a short time later, Mitchell heard gunshots. She did not see Belardo or Blaylock again that night.

---

[10] On cross examination, the police officer testifying about the distance admitted that it was his best guess, but that it was possible that, if Google Maps indicated a distance of 1.7 miles, that distance might be correct.

**D.** *Francisco Garcia's Account of Blaylock and "Willie"*

At the time of the homicide, Francisco Garcia lived next door to Blaylock and .46 miles from Zarate's trailer. About 9:00 p.m., Garcia heard sirens and saw police cars going by. Blaylock then came to Garcia's house with "a Black guy" named "Willie"[11] and asked to use the telephone. Garcia testified that he knew Willie's brother, Felix, and he had seen Willie driving around in Felix's car.[12] Blaylock and Willie appeared exhausted, as if they had been running. Willie left a short time later, but Garcia did not know how long Blaylock stayed.[13]

**E.** *Bango's Account of Belardo's Admissions*

Bango returned to Moore's party that evening with Ellis and a friend, and, on arrival, encountered Delatorre, bleeding and seeking help. After taking Delatorre to Moore's residence to call the police, Bango and Ellis returned to Bango's house.[14]

When they arrived home, Belardo and Rivera were there. Bango asked whether Belardo had anything to do with the shooting. Belardo appeared agitated and told him to "Shut up." Bango asked Belardo several times whether he was involved and Belardo responded by making threats. He said, "I did it once. What makes you think I won't do it again?" Bango understood that Belardo would kill him if he talked to anybody about the incident. Belardo told him, "I'll beat the 'F' out of you" and "Don't say anything. You are trying to get me 25 to life."

Bango testified that Belardo suggested he take responsibility for the shooting, telling him that because he was a minor his punishment would be relatively light.[15]

---

[11] Belardo was known as "Willie."

[12] On cross-examination, Garcia said that he did not "know" the man he referred to as "Willie." Garcia failed to identify Belardo in a pretrial photo lineup in 2009, selecting another photograph, but saying he was "not sure."

[13] Garcia admitted lying to police when he told them in 1998 that Blaylock had stayed at his house the entire night.

[14] Bango's account of meeting Delatorre in the street was not corroborated by other witnesses. Delatorre did not mention it. Ellis testified that when they arrived at Moore's, the road was blocked off and they saw police officers, so they went back home.

Belardo told Bango that he should expect to be questioned by the police and that Bango needed to corroborate his alibi about being in the backyard playing with the dog.

## F. *Ellis's Account of the Gun and Belardo's Admissions*

Ellis had moved in with Belardo about a month before the Zarate homicide. She testified that Belardo sold drugs and that, on his behalf, she sold drugs at school. About a week before the homicide, Ellis overheard Belardo in a telephone conversation "about the guy in the trailer that sold drugs." Belardo said he was "considering robbing" the man. She did not know with whom Belardo was speaking.

On the night of the homicide, when she and Bango returned home after trying to go to Moore's party, Belardo was home, shaving, and "shaking and scared." They started talking about the shooting. Ellis said that Belardo wanted Bango to confess to the shooting, saying he was only 15 years old and would not "do very much time."

Belardo told Ellis "he didn't go there to do that. He went there to rob him and ended up shooting a guy; probably took a guy's life. It wasn't worth very much. They didn't even get very much money out of it." Belardo said that Blaylock was with him.

Ellis was scared because she was dating Belardo and living in his house. Belardo and Ellis began taking measures to "stay out of the view." They hid in a crawl space in Rivera's closet and Belardo would hide in the trunk of their vehicle as they were driving. Belardo told Ellis that, when questioned by the police, she should say that he was in the back yard that night playing with the dogs because the back yard was far enough from the house to set off his ankle monitor.

Ellis testified that a day or two after the shooting, Rivera asked Ellis to accompany her and they drove to Lake Berryessa. Rivera handed Ellis a revolver, which she recognized as belonging to Belardo, and she threw it into the water from the edge of a

---

[15] Bango did not tell investigators that Belardo suggested he take responsibility until 2008.

cliff.[16]  After Ellis disposed of the gun, Belardo told her he would harm her or her family if she "confessed."

Ellis later married Belardo.  They moved first to Florida and then to Tennessee, where Belardo continued to threaten her, saying that with what she knew about the shooting, she "could really put him in jail for a long time, so he said it was all on me." He told her that no one would ever find her body, and her family would not know that she was gone.  On one occasion he held a gun to her head and beat her severely.  Ellis eventually left Belardo and had no contact with him after 2002.

In 2009, Belardo was incarcerated in Tennessee and was disciplined for adding some dreadlocks to his short hair.  James Russell, an employee at the Tennessee correctional facility, testified that Belardo told him he was facing a murder charge in California and "he wanted to change how he looked."

### DISCUSSION

**I.  *Waiver of Trial by Jury on the Special Circumstance Allegation***

On April 20, 2011, prior to the commencement of jury selection, Belardo's counsel stated that Belardo was prepared to waive trial by jury.  The court gave the People time to consider waiving jury trial and, after a recess, the People stated their willingness to waive as well.  The court instructed Belardo's counsel to conduct a voir dire of Belardo, which proceeded as follows:  "[Y]ou have a right to have a jury trial, a jury of 12 people, listen to this case.  By waiving that right, that means that you will not have a jury trial, that the person who is going to be judging the facts and credibility of the case will be the judge alone.  [¶]  You have a right to have the jury trial.  [¶]  Are you willing to waive it?"  Belardo answered in the affirmative and his counsel announced, "Defense waives."  The court asked Belardo, "You understand, when you say, 'you waive,' that means you are giving up that right?"  Belardo answered, "Yes, sir."  The court then asked, "And I'm the one that makes the decision, guilty or not guilty.  Do you

---

[16] Ellis did not tell investigators about throwing the gun into Lake Berryessa until 2008.  The investigators then searched the area of the lake, and surrounding dry bank, specified by Ellis, but did not find the firearm.

9

understand that?" Belardo again answered, "Yes, sir." Finally, the court asked, "And you're prepared to give up that right and have me do that?" Again, Belardo answered, "Yes, sir." The court then accepted the jury waiver.

Belardo contends that the record does not contain a knowing and intelligent waiver of the right to a jury determination of the special circumstance allegation that the murder of Zarate took place during commission of a robbery (§ 190.2, subd. (a)(17)(A)). Without such a waiver, he argues, we must reverse the finding on the special circumstance and adjust his sentence to life in prison with the possibility of parole.

Section 190.4, subdivision (a), expressly provides the procedure for reaching findings on special circumstance allegations at bench trials: "If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court." Our Supreme Court has construed this provision to mean that "an accused whose special circumstance allegations are to be tried by a court must make a separate, personal waiver of the right to a jury trial." (*People v. Memro* (1985) 38 Cal.3d 658, 704 (*Memro*), overruled on other grounds by *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) "Assuming an accused desires to waive his right to a jury as to both the guilt and special circumstance determinations, the trial court could satisfy section 190.4, subdivision (a)'s requirement by taking separate waivers as to each before commencement of trial." (*Memro*, at p. 704.)

In *People v. Diaz* (1992) 3 Cal.4th 495 (*Diaz*), the defendant was advised: " '[Y]ou'll be giving up that right to have the jury in two different functions. First of all, first function is to decide the question of your guilt or innocence. Then the second function, similarly, . . . you would have 12 jurors who must unanimously agree as to the punishment . . . . And you'll be giving up that right.' " (*Id.* at p. 564.) The defendant answered, " 'I'm giving it up' " and acknowledged his understanding that the waiver applied "to 'both phases . . . of the special circumstances case.' " (*Ibid.*) The *Diaz* court explained that under *Memro*, "a waiver of a defendant's right to have a jury determine the truth or falsity of alleged special circumstances may not be accomplished by counsel's

10

stipulation. The waiver must be made by the defendant personally, and must be 'separate'—that is, if the defendant is to be deemed to have waived the right to jury trial on both guilt and special circumstances, the record must show that the defendant is aware that the waiver applies to each of these aspects of trial." (*Diaz* at p. 565.) Applying this rule, the court concluded: "In this case, the trial court explained to defendant that the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end. Defendant also told the court that he had discussed the matter 'quite thoroughly' with his counsel. Although the trial court's admonition was not a model of clarity, we believe it was sufficient to advise defendant that his waiver, which included all aspects of guilt and penalty, included within it a waiver of the right to jury trial on the truth or falsity of the special circumstance allegation." (*Ibid.*)

The defendant in *People v. Wrest* (1992) 3 Cal.4th 1088 (*Wrest*) was advised that his right to a jury trial included " '*any other special allegations that are charged in this particular case*.' " (*Id.* at p. 1103.) He was also told that if tried by a jury, all 12 jurors would have to agree on the special circumstances. (*Ibid.*) The defendant then waived his right to a jury trial as to the " '*special allegations that we've already talked about*' " and agreed that he did not " '*want a jury trial on the issue of guilt or the special circumstances*.' " (*Id.* at p. 1104.) The court held that the record "reflects an express and personal understanding and waiver of appellant's right to jury trial on the special circumstance allegations. The mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver." (*Ibid.*) The court explained that *Memro* "does *not* require . . . a waiver to be taken in accordance with any particular procedure." (*Id.* at p. 1105.)

In *People v. Weaver* (2012) 53 Cal.4th 1056 (*Weaver*), the Supreme Court again rejected a defendant's contention that *Memro* required a finding that his waiver of a jury trial was not a waiver of a jury finding on the special circumstance allegation: "In this case, the record demonstrates that defendant's jury waiver included the special circumstance allegations. The written waiver regarding guilt that defendant and his counsel signed did not specifically reference the special circumstance allegations. But in

11

the oral proceedings, the court advised defendant that 'a waiver of jury is a waiver of jury on all of the triable issues before the court.' It explained to defendant twice that these issues included the special circumstance allegations. Additionally, the written waiver as to penalty, which defendant and his counsel also signed, expressed defendant's desire to waive a penalty jury if, at the guilt phase, he was 'found guilty of first degree murder *and a special circumstance is found true.*'. . . Defendant understood and intended his waiver to include both guilt and special circumstances as well as, if it came to that, the penalty determination. To require more, or to mandate a different procedure, would exalt form over substance." (*Id.* at p. 1075.)

*Diaz*, *Wrest*, and *Weaver* all had records demonstrating that the defendant was aware that his waiver applied both to the issue of guilt and to the issue of the truth of a special circumstance. In each case, during colloquy with the court, the special circumstance aspect was specifically mentioned, or the defendant was informed that his waiver applied to *all* triable issues and the written waiver noted the special circumstance aspect of the trial. In Belardo's case, no written waiver was executed and in the colloquy with the court, there was no mention of the special circumstance aspect of the charges. Belardo's attorney did obtain Belardo's agreement that "the person who is going to be judging the facts and credibility of the case will be the judge alone," but this does not demonstrate (as a reference to "all triable issues" might have) that Belardo understood his waiver to apply not only to the issue of guilt, but also to the special circumstance.

We conclude that the record does not demonstrate that Belardo was aware that his waiver applied to both guilt and the special circumstance allegation. The *Diaz* test is not satisfied and it was error for the court, and not a jury, to make a finding on the special circumstance.

Belardo argues that "[p]rejudice in a failure-of-advisement context is measured by whether the defendant was aware of his constitutional rights." None of the cases he cites for this proposition involves the separate waiver of a right to a jury trial on a special

12

circumstance allegation.[17] *Memro* made clear that an error in obtaining a separate waiver to a jury trial on a special circumstance allegation does not require automatic reversal— prejudice must be shown: "In this case, the record is clear that the trial court erred in failing to take a personal jury waiver on the multiple murder special circumstance allegation. However, since the judgment must be reversed on other grounds, it is unnecessary to determine whether appellant was prejudiced by that error. The question as to what standard of prejudice should be applied in this situation is left for another day."[18] (*Memro*, *supra*, 38 Cal.3d at pp. 704-705, fn. omitted.)

Here, the evidence that Zarate was shot during the course of, at a minimum, an attempted robbery, was uncontroverted. Defense counsel argued that there was no evidence that the two assailants took anything. However, Delatorre testified without equivocation that the gunman told Zarate, "This is a robbery. Give us the money, the jewelry, and the dope." Delatorre also stated that his wallet was taken, but even if the robbery had not been completed, there was no question that the victim was shot during an attempt to rob him and Zarate. Moreover, Ellis testified that before the homicide, Belardo discussed robbing "the guy in the trailer" in a telephone conversation, and after the homicide he told her that "[h]e went there to rob him."

The error in failing to obtain a separate waiver on the special circumstance allegation from Belardo was harmless under any standard of prejudice. Once having determined that Belardo murdered Zarate, no reasonable trier of fact could have failed to find that the murder occurred in the commission of a robbery. (See *People v. Simpson*

---

[17] *People v. Stills* (1994) 29 Cal.App.4th 1766, 1770; *People v. Howard* (1992) 1 Cal.4th 1132, 1180; *People v. Mosby* (2004) 33 Cal.4th 353, 359, and *People v. Christian* (2005) 125 Cal.App.4th 688, 691, all involved the admission of a prior felony and whether the defendant was sufficiently aware of his constitutional rights.

[18] The *Memro* court reversed the defendant's conviction because "the trial court erred in summarily denying [defendant's] discovery motion." (*Memro*, *supra*, 38 Cal.3d at p. 665.) Even though the court had already determined that reversal was required on another ground, it addressed the issue of failure to obtain a separate waiver of jury on the trial of the special circumstance allegation "[b]ecause this issue is an important one likely to arise not only on retrial in this case but in many cases . . . ." (*Id.* at p. 700.)

(1991) 2 Cal.App.4th 228, 236-237 [concluding the even if there had been error in failing to obtain a separate waiver to a trial by jury on a special circumstance allegation, that error was harmless because of overwhelming evidence supporting the special circumstance allegation].)

## II. *The Testimony of Ellis and Bango*

Belardo contends that the court erred by admitting the testimony of Ellis and Bango concerning statements he made to them. His argument is that Ellis and Bango were accomplices and, therefore, their testimony could not be admitted without corroboration, which, he also contends, was lacking.

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

## A. *Bango*

Belardo argues that Bango was liable to prosecution for the murder of Zarate for three reasons: (1) Bango briefly held Belardo's gun at Moore's party several hours earlier, which Belardo characterizes as a "convenient excuse for fingerprints, should any materialize"; (2) Bango had a dark enough complexion to be considered one of the two African-American robbers; and (3) Bango testified to an encounter with Delatorre after the shooting, contradicting the testimony of other witnesses, which Belardo characterizes as a fabrication to provide a reason why Delatorre might pick him from a lineup, should that eventuality arise. Belardo's characterization of the cited facts is rank speculation. To suggest that this amounts to probable cause to charge Bango with the murder of Zarate verges on frivolous argument.

14

**B.** *Ellis*

Ellis testified about her participation in Belardo's drug sales. Belardo's argument concerning why Ellis could be charged with the murder of Zarate is not clear, but seems to be that the murder was a natural and probable consequence of Belardo's drug sales, to which Ellis was an admitted accomplice. We do not accept Belardo's suggestion that murder is a natural and probable consequence of dealing drugs. (See *People v. Hinton* (2006) 37 Cal.4th 839, 880 ["[n]or do we accept defendant's suggestion that murder was a natural and probable consequence of any drug deal 'involving a large sum of money' "].)

Ellis might have been liable for prosecution as an accessory (§ 32) to the murder of Zarate, because she threw Belardo's gun into Lake Berryessa, but not as a principal (§ 31), so she was not liable to prosecution for the identical offense with which Belardo was charged. Accordingly, Belardo's contention that Ellis was an accomplice fails.

Because Bango and Ellis were not liable to prosecution for the murder of Zarate, section 1111 does not apply and their testimony did not require corroboration. Thus, we need not reach the question of whether their testimony was, in fact, corroborated.[19]

**III.** *Sufficiency of the Evidence*

Belardo contends that insufficient evidence established his identity as the shooter in the Zarate homicide.

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine

---

[19] We note that even if, contrary to our determination, Ellis were an accomplice, her testimony was corroborated by Bango, and the additional evidence discussed in part III of this opinion placing Belardo at or near the scene of the crime before and after it.

15

the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

We have no difficulty determining that substantial evidence supported the identification of Belardo as the gunman in the Zarate homicide. Ellis testified that she overheard a conversation that Belardo had on the telephone about robbing a man in a trailer. She also testified that Belardo told her, among other admissions, of going to rob a man, but "it didn't turn out as well, and he ended up shooting a guy." She hid with Belardo immediately after the shooting and disposed of a revolver like the one used to kill Zarate.

Bango testified that Belardo was in possession of a gun on the day Zarate was killed. He also testified that Belardo threatened him when he asked Belardo about his involvement and that Belardo suggested he take the blame for him.

Other evidence also supported a finding that Belardo was guilty, including Delatorre's testimony that the gunman looked like one of the two persons he had seen watching him and Zarate from Moore's party that day, and that he had seen the gunman previously, in a Mustang convertible, about a week before the shooting. A number of witnesses testified that Belardo rode in Felix's Mustang convertible. Garcia testified that Blaylock and Willie, whose brother Felix he knew, came to his residence exhausted, as if they had been running, while police responded to the Zarate crime scene.

It is for the trial court to determine whether to believe each of these witnesses, despite their failure to tell the police the truth when first interviewed. Because substantial evidence supported the court's determination that Belardo was the shooter in the Zarate homicide, we reject Belardo's attack on the sufficiency of the evidence.

## IV. *Alleged* **Brady** *Violation*

Belardo contends that material exculpatory evidence was not provided to him before trial, depriving him of a fair trial.

16

## A. *Background*

After Belardo began to present his defense, it came to light that the defense had not been provided with three reports, from the 1998 investigation of the Zarate homicide, that Belardo contends were material to his defense. The issues raised do not require us to examine why these reports were not turned over before trial, so we review here only their content.

The first report summarized an interview with Zarate's former girlfriend, identified as Donna Sanders.[20] Sanders told police that on February 13, 1998, David Castaneda, with two associates, came to Zarate's trailer and argued with him about a camera he had accepted in exchange for methamphetamine. During the argument, Sanders heard Castaneda tell Zarate, "I'll just kill you."[21] Sanders said she knew the Castaneda family to be violent and the threat made her concerned for Zarate's safety. Although Sanders knew that Castaneda had been arrested the day before Zarate was shot, she believed that the family was responsible for the killing. Sanders believed that Castaneda's brother, Monce Castaneda (Monce), was "capable of this type of crime" and that he was "hanging out" in Vacaville with an African-American male, about 30 years old, with a stocky build, and six feet tall. Sanders thought that Monce was "taking care of business for his brother . . . when he attacked and shot [Zarate]."

The second report concerned Lewis Thomas. The investigator was attempting to identify the African-American male reported to be associating with Monce. Thomas was African-American and had been arrested with Monce in 1993. According to the report, a photo lineup that included Thomas's photograph was shown to Delatorre. Delatorre

---

[20] After the trial, defense investigator discovered, after the trial, that the police actually interviewed Danyielle Sanders, who was Zarate's former girlfriend, and not Donna, her sister.

[21] The defense was already aware that Castaneda had an argument with Zarate over a camera, because Delatorre had mentioned that fact in an interview with the police. A transcript of that interview was provided to Belardo. Delatorre did not, however, say that a death threat was made. Delatorre said that Castaneda wanted the camera back and he believed that Zarate had returned it.

indicated that photo number three (not Thomas) "looked very familiar" and then pointed to Thomas's photo and said it "looks familiar."

Following the photo lineup, the investigator interviewed Thomas.[22] Thomas said that on the night Zarate was killed, he was at home with his wife and children, and that he had not seen Monce or been in Solano County since 1993. He said he was willing to take a computer voice stress analysis (CVSA) examination to prove his innocence. The exam results indicated no deception when Thomas denied being involved in the shooting. When the investigator told Thomas that a pair of pants with a red stain on them was found in his house, Thomas said the stains were from a red marker. He suggested the investigator could have the pants tested.

The third report was of a police interview with Monce, who denied involvement in the Zarate homicide and said he was with friends in Watson on the night it occurred. Monce agreed to a CVSA examination and the investigator "ran two charts." Review of the second chart indicated deception on two of the relevant questions. Monce said he might be showing stress because "he has been out in the street and he has heard that people are saying he was involved in the shooting." Monce reiterated his denial of involvement and the investigator "opted to do a third chart." No deception was indicated and the investigator concluded that "all indicators reflect that he is being honest in this exam." Monce agreed to participate in a lineup if requested.

**B. *Legal Standard***

**1. *Brady Violations***

In *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) "the United States Supreme Court held that a defendant's right to due process is violated when 'favorable' evidence that has been 'suppressed' by the prosecution is 'material' to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested." (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1312.) *Brady* and other federal precedent establish "a duty on the part of the

---

[22] Although the investigator's report had not previously been provided to Belardo, a transcript of the interview with Thomas had been provided.

prosecution, even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness." (*People v. Ruthford* (1975) 14 Cal.3d 399, 406 (*Ruthford*), overruled on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 545-546, fn. 7.) "The scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to the others acting on the government's behalf . . . .' [Citation.] Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." ' " (*In re Brown* (1998) 17 Cal.4th 873, 879.)

"Evidence is 'material' [under *Brady*] 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian*, *supra*, 9 Cal.4th at p. 544.) "The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt. The prosecution does not have to risk reversal simply because a complete accounting of all conceivably exculpatory evidence is not made." (*Ruthford*, *supra*, 14 Cal.3d at p. 409.)

We review the elements of a *Brady* claim de novo. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

## 2. *Third-Party Culpability*

"[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it

is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.)  " 'Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant.  But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime.' "  (*People v. Linton* (2013) 56 Cal.4th 1146, 1202.)

**C.** *Application to Belardo's Case*

The essence of Belardo's argument is that the late production of documents relating to the investigation of the Castanedas in 1998 prevented him from mounting a viable defense of third-party culpability, depriving him of a fair trial.  As he puts it: "[T]he error in the instant case cannot be shown harmless beyond [a] reasonable doubt. . . .  Thomas presented a far more viable candidate as Zarate's murderer having been identified as 'looks familiar' by Delatorre in a photographic lineup.  The motive provided by a used-camera-for-methamphetamine deal gone [bad] compared favorably with that of a crime-of-opportunity robbery selecting a low-budget methamphetamine dealer.  Indeed, post-trial investigation would reveal that Danyielle Sanders, misnamed 'Donna' Sanders in the late-disclosed police reports, was available to testify that she was Zarate's girlfriend in 1998 and witnessed the death threat by David Castaneda. . . .  The third-party-culpability evidence as to the Castaneda family threat compared favorably with that produced against appellant at trial.  It certainly raises a doubt as to who is the actual responsible [*sic*] for shooting Zarate."

We disagree.  The statement by Delatorre that a photograph of Thomas looked familiar, does not link Thomas to the shooting of Zarate.  Stating that a person "looks familiar" is far different from stating "this person looks like the person who shot Zarate." Similarly, there is no information in the reports of interviews with Thomas and Monce that would link them either directly or circumstantially to the Zarate homicide.  The death

20

threat by Castaneda might indicate motive for him to kill Zarate, but does not supply information linking Castaneda, or his family, to the homicide.

Belardo's theory of third-party culpability, based on the late-produced reports from the People, is purely speculative. The information in these reports does nothing to diminish the credibility of Bango or Ellis, who provided independent accounts of Belardo's statements admitting his participation in the Zarate homicide. Nothing here undermines our confidence in the outcome reached by the trial court. Thus, the late-produced information was not material and no *Brady* violation occurred.

Belardo also challenges the trial court's failure to grant its motion for a mistrial based on the late-produced reports from the 1998 investigation. Because these reports were not material to Belardo's defense, he was not prejudiced by the late production, and there is no reason for us to reexamine the trial court's denial of a mistrial.

## V. *The Delay in Prosecution*

Belardo argues that, brought to trial in 2011 for a crime that occurred in 1998, he was prejudiced by the delay in prosecution, and the prejudice was aggravated by the delay in disclosure of information related to the investigation of potential involvement in the crime by the Castaneda family, discussed above.

"Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." The prosecution's investigator admitted that "[t]he maintenance of the files have been kept in less than adequate order, as well as the order in which they were maintained within the binders, interviews by each of the investigators involved should have been kept in order of date and the person(s) conducting the interview. Unfortunately they were not." While the information turned over to the defense may have been disorganized and, as already discussed, not produced for the defense in a timely manner, Belardo does not explain how

21

this prejudiced his case and rendered his trial unfair. We have already determined that the late-produced investigation reports were not material and the defense was not prejudiced by the late production. While the defense may have had difficulty constructing "an accurate review of the investigation," Belardo does not argue that the defense was unable to do so or explain how a better understanding of the police investigation would have affected the outcome of the trial to his advantage.

Belardo next cites the problem that "[p]hysical evidence that had been collected was no longer available for testing." This evidence, once in the possession of the police but not available at trial, includes a bicycle found in a vacant lot near the crime scene; a small backpack; and Delatorre's composite drawing of the shooter.

The police seized the bicycle on the night of the murder because it was in a vacant lot near the crime scene and a neighbor did not recognize it. The officer who collected it thought it had been there for some time because it was covered with dew. The police department disposed of the bicycle sometime between 1998 and Belardo's trial. The police also collected the backpack that night, but no information about it, beyond the fact of its collection and its description, is in the record.

Belardo observes that neither the bicycle nor the backpack were tested for gunshot residue, fingerprints, or DNA evidence and that, because they are now missing, they cannot be tested now. However, nothing in the record links the bicycle or the backpack to the shooting of Zarate, so any significance they might have is speculative. Belardo has failed to show that the absence of the bicycle or the backpack was prejudicial to him.

The composite drawing might have been useful to Belardo in challenging the credibility of Delatorre's identification of Belardo, but it would only have been cumulative because no trier of fact could have given much weight to that identification. The defense was able to clearly establish that Delatorre had examined multiple photographic lineups that included Belardo and had failed to identify Belardo as the shooter. Delatorre also was unable to identify Belardo as the shooter at a live lineup. By the time Delatorre provided his less than certain identifications of Belardo at the conditional hearing (where Belardo appeared in prison garb) and at trial, he had seen

22

Belardo or his images multiple times. Because the defense was able, without the composite drawing, to effectively compromise Delatorre's identification, the lack of the drawing was not prejudicial.

Belardo also argues that some of the photographic lineups shown to Delatorre had been lost and that the investigators' recollections about the lineups were "rather faded." Any missing material or faded memories concerning the photographic lineups could only have served to impeach Delatorre's identification of Belardo and, like the missing composite drawing, would only have been cumulative.

The missing bicycle and backpack, the lost composite drawing, and any missing information about photographic lineups had nothing to do with Ellis's and Bango's testimony concerning Belardo's admissions and threats, and could not have served to cast doubt on the prosecution's primary evidence against him.

We conclude that Belardo has failed to demonstrate prejudice from the delay in prosecution and we need not proceed to examine justification for the delay.

## VI. *Waiver of Trial by Jury on the Issue of Guilt*

Belardo contends that the late-produced reports from the 1998 investigation, discussed above, worked to render his waiver of a trial by jury on the issue of guilt neither knowing nor intelligent.

"To be valid, a defendant's waiver of the right to a jury must also be 'knowing and intelligent, that is, " ' "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it," ' " as well as voluntary " ' "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." ' " ' " (*Weaver*, *supra*, 53 Cal.4th at pp. 1071-1072, quoting *People v. Collins* (2001) 26 Cal.4th 297, 305.)

Belardo appears to believe that a waiver, made knowingly and intelligently, might later be rendered unknowing or unintelligent because some facts about the case, not contemplated at the time of the waver, come to light. He is wrong. "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the

circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." (*United States v. Ruiz* (2002) 536 U.S. 622, 629.) The late-produced discovery had no bearing on Belardo's prior understanding of the nature of the right to a jury trial and how waiving that right would apply in general.

## VII. *Denial of a New Trial*

### A. *Background*

On July 1, 2011, Belardo filed a motion for a new trial based, in part, on the ground that new evidence had been discovered that was material to his defense. The motion and supporting declaration by a defense investigator related that Danyielle Sanders had been located in prison and that she recalled the death threat made against Zarate, but that she was unwilling to make a declaration or testify, for fear of retaliation. According to the defense investigator, Sanders also said that "she was not sure if she was remembering David Castaneda as actually being present and making the threat against . . . Zarate because she had read the report to refresh her memory during my initial visit with her or because mentioning the Castaneda family name caused her to recall the past event."

On July 12, 2011, Belardo filed a supplemental motion for a new trial, providing additional new evidence—a declaration by Tiffany Stevens. According to the declaration, Stevens was visited one evening in 1998 by her friend Monce (no last name provided), accompanied by an African-American man named David. Monce told her that they had just robbed and shot someone, and that David was responsible for the shooting.

On August 18, 2011, after a hearing, the trial court denied the motion for a new trial, stating: "As to whether or not there is new evidence to support the defendant's motion, I think the only thing we knew, no new documents were filed with the court to raise further opportunities to speculate as to some third person or some other person who might be involved. None of it is compelling and would lead the court to believe any of these Castaneda people were involved in this particular violation."

**B.** *Legal Standard*

Section 1181 provides the grounds upon which a court may grant a new trial. One of the listed grounds, section 1181, subdivision 8, is: "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

In order to prevail on a motion for a new trial based on newly discovered evidence, a defendant must show the following: (1) the evidence itself, and not simply its materiality, is newly discovered; (2) the evidence is not merely cumulative; (3) the new evidence would make probable a different result on retrial; (4) the moving party could not, with reasonable diligence, have discovered and produced the new evidence at the trial; and (5) these facts are demonstrated by the best evidence that the case admits. (*People v. Dyer* (1988) 45 Cal.3d 26, 50-51.)

" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1318, abrogated on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 560-561.) However, when a significant constitutional issue is implicated in a motion for a new trial and the trial court denies the motion, some courts apply a de novo standard of review. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

**C.** *Application to Belardo's Case*

Belardo contends that he was entitled to a new trial because of the newly discovered evidence and that the trial court erred in denying him a new trial. He argues that we should engage in a de novo review because his motion for a new trial implicates issues of due process.

We review the denial of Belardo's motion for abuse of discretion because "the exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261.)

In order to prevail in its motion for a new trial, Belardo had to demonstrate, among other things, that the new evidence would make probable a different result on retrial. There is no indication that the court failed to appreciate the content of the offer of new evidence or that it failed to weigh that offer against the evidence presented at trial. Indeed, the court found that the evidence against Belardo was "substantial and compelling": Bango, Ellis, and Delatorre, "as well as the other witnesses, all testified, and it appeared to the court they were truthful, although there were a number of contradictions in their presentation of the evidence and what they said 13 years before during interviews, some of which was not the same. But the main theme, and throughout the entire trial, was that [Belardo] is the one who committed the crimes."

The court concluded that the offer of new evidence was not compelling and would not lead the court to believe that the Castanedas or their associates were involved in Zarate's murder. We detect no abuse of discretion in that determination by the court.

## DISPOSITION

The judgment and orders of the trial court are affirmed.

_____
Brick, J.*

We concur:


_____
Kline, P.J.


_____
Richman, J.

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.