Filed 3/27/14  P. v. McCowan CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>RAYMOND McCOWAN,<br><br>     Defendant and Appellant.</td><td>A135463<br><br>(City & County of San Francisco<br>Super. Ct. No. 216403)</td></tr>
</table>

Defendant Raymond McCowan appeals from a judgment convicting him of kidnapping his wife and sentencing him to 13 years in prison. On appeal, he contends the court erred by admitting prejudicial propensity evidence, that the prosecutor failed to disclose material exculpatory evidence, and that his attorney rendered ineffective assistance. He also challenges the sufficiency of the evidence in support of his misdemeanor conviction for obstructing or delaying a police officer and in support of a prior serious felony conviction enhancement. Finally, defendant asserts that the court abused its discretion in sentencing him to the aggravated term for his kidnapping conviction. We shall affirm.

**Factual and Procedural History**

Defendant was charged by amended information with kidnapping (Pen. Code,[1] § 207, subd. (a); count one); domestic violence (§ 273.5, subd. (a); count two); assault with force likely to cause great bodily injury (§ 245, subd. (a)(1); count three); violation of a stay-away order (§ 166, subd. (c)(1); count four); and resisting, obstructing, or

---

[1] All statutory references are to the Penal Code unless otherwise noted.

1

delaying a peace officer (§ 148, subd. (a)(1); count five). The amended information further alleged that between 1982 and 1989, appellant had suffered five prior convictions within the meaning of section 667, subdivision (a)(1).

The following evidence was presented at trial:

At approximately 11:00 p.m., on March 11, 2011, the police received an emergency call from Sheila Williams. When Officer Brian Knuecker and his partner responded to Williams's home, Williams told them defendant had kidnapped his wife, Ladonna Christian. Williams did not testify at trial but according to Knuecker's testimony, she told the police that her sister, Christian, was staying with Williams because defendant had been beating her. That night, Williams and her husband, Milton Wright, had opened the front door to leave the house when defendant appeared and pushed them back inside. Defendant had a taser in his right hand and a firearm in his left hand. Defendant put the taser against Williams's neck. Defendant grabbed Christian, dragged her by the hair, and forced her into his vehicle. Along the path of the abduction, officers observed two hair extensions and a broken piece of wood. According to Knuecker's recounting of what Williams said , defendant told Christian, "I'm going to kill you," and "Bitch, you going with me." Williams told the officers that she believed defendant might kill her sister. Williams thought defendant was taking Christian to their home on Scott Street.

The first San Francisco police officers arrived at defendant's Scott Street home around 11:30 p.m. When they arrived, they saw the apartment lights shining through the window shades. One of the officers banged on the metal gate with his flashlight and identified himself as a police officer. Thirty seconds to a minute later, the apartment lights went off.

Over the following two hours, officers made numerous attempts to contact defendant inside the home. They knocked on the doors and windows several times, but received no response. Other officers attempted unsuccessfully to contact defendant by phone.

Around 1:00 a.m., Officer Patrick Robinson pressed his ear to the apartment wall and heard the faint sound of a woman crying. Robinson also heard male and female voices inside the apartment, but could not hear what they were saying.

Shortly before 2:00 a.m., the police department's tactical unit breached the apartment's back door. In the rear bedroom, they found defendant and Christian. In an adjacent bedroom, officers found the couple's son, 15- year-old R.

After the tactical unit secured the apartment, Officer Knueker entered the apartment and spoke with Christian. She had fresh bruises on her face and was bleeding from her mouth, nose, and lip. She also appeared to have been punched in the eye. She was crying, hysterical and very fearful. Police investigators attempted to interview Christian at the scene, but she was angry and uncooperative.

At trial, Christian told a very different story. She testified that for a night and a day before the police came into her home on Scott Street, she had been at her sister's home. On the night of the incident, she and her sister had argued over money her sister owed her. The dispute became physical and while she and her sister were fighting, a friend of the sister grabbed Christian, hit her and dragged her out the door. During the struggle, her hair was pulled out and the fence was broken. She called defendant and asked him to come for her. After defendant picked her up, they picked up R. and returned home and fell asleep. The next thing she remembered was the police entering her bedroom. She told the investigator she was jumped at her sister's house but the investigator refused to believe her. She agreed to go to the hospital only because the officer threatened to call child protective services to take her son if she refused.

R. also testified at trial, confirming that his parents picked him up at 9:30 p.m. His mother had blood on her face when she was in the car, but she would not tell him what had happened to her. He claimed that he went to sleep as soon as they got home and did not speak to his parents again until after the police entered the apartment and woke him. He did not hear a telephone ringing that night or hear anyone tapping on the gate, saying "Police." On cross-examination, R. denied telling a defense investigator that he heard the police banging on the door around 11:00 p.m. and yelling for him to open up. He also did

3

not recall telling the investigator that his father wanted to open the door but was afraid that the police would shoot him if he did.

After the incident, the police learned that a San Mateo County protective order prohibited defendant from contacting Christian. At trial, however, Christian denied asking for a stay-away order or trying to keep defendant away from her.

Testimony was also given regarding an incident that occurred just over a year prior, in February 2010. Christian and R. had spent a weekend in February at a La Quinta Hotel in South San Francisco while defendant was out of town. During their stay, Christian incurred over $250 in charges to the room telephone. When defendant arrived at the hotel to pick up his family, he attempted to negotiate with the manager to have the phone charges reduced. When the manager refused to reduce the charges, defendant became very agitated. He stormed out of the hotel and got into the truck in which Christian and R. were waiting. The manger watched through the window as defendant vigorously beat Christian with something that looked like a hammer or a crowbar. He saw defendant hit her at least six times before driving away. The manager asked an employee to call the police while he copied defendant's license plate. The police stopped the truck about one-quarter mile from the hotel. The officer who stopped defendant's car testified that Christian had scratches on at least one arm and seemed frightened. When she exited the car, he noticed that she was walking with a limp. She also complained of pain to her right forearm and right leg. Christian agreed to go to the police station with him, where he took photographs of her injuries. A black hammer was located in a search of defendant's truck. Dr. Diana Emerson testified at trial that the injuries depicted in the photos taken at the police station were consistent with the hammer found in the truck.

Christian testified that she injured herself at the La Quinta hotel because she had been drinking and had slipped. In the morning, when defendant picked her up, she was still feeling injuries from the night before; she was limping and had several bruises. She denied arguing with defendant about the room charges and denied that defendant hit her with a hammer. R. confirmed his mother's story.

4

The jury found defendant guilty of all counts and the court found true the allegation that defendant's 1982 guilty plea to assault with a deadly weapon constituted a prior serious felony conviction under section 667, subdivision (a)(1). Defendant was sentenced to a total term of 13 years in prison, calculated as follows: the upper term of eight years for the kidnapping conviction plus a consecutive five-year term for the prior conviction. Pursuant to section 654, the court stayed counts two (domestic violence) and three (assault with force likely to cause great bodily injury) and their related enhancements. For counts four (violation of a stay-away order) and five (resisting, obstructing, or delaying a peace officer), the court imposed the maximum misdemeanor terms of one year, to run concurrently with the felony sentence. Defendant filed a timely notice of appeal.

## Discussion

**1.     The trial court did not abuse its discretion in admitting testimony regarding the incident at the La Quinta Hotel.**

" 'Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109).' [Citation.] '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citations.] '[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited.' " (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)

"The admission of prior acts as propensity evidence encompasses both charged and uncharged acts. [Citations.] Moreover, evidence of a prior act may be introduced as

propensity evidence even if the defendant was acquitted of criminal charges based upon that act. [Citation.] [¶] Even if the evidence is admissible under section 1109, the trial court must still determine, pursuant to [Evidence Code] section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. [Citation.] The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown*, *supra*, 192 Cal.App.4th at p. 1233.)

Defendant acknowledges that the evidence regarding the prior domestic violence incident was admissible under Evidence Code section 1109 but argues that the court abused its discretion in not excluding the evidence under Evidence Code section 352 because the evidence was unduly burdensome on the defense and was highly prejudicial.[2] We disagree.

---

[2] Defendant also suggests that the prosecution failed to provide sufficient pretrial discovery on this issue. The record reflects, however, that on November 22, at the start of trial, the court confirmed with the prosecutor that he had complied with the pretrial disclosure requirements of Evidence Code section 1109, subdivision (b), which requires that the prosecution "disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054. 7 of the Penal Code." Section 1054.7 in turn requires that disclosure be made "at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately." Defense counsel did not dispute the prosecutor's compliance with subdivision (b) at that time. Although he later argued that this evidence was too prejudicial to be admitted because the La Quinta incident was still being investigated, he did not assert a failure to properly disclose the evidence. Having failed to object, defendant has forfeited any claim regarding insufficient disclosure on appeal. In any event, insofar as nothing in the record suggests that the prosecutor unreasonably delayed in disclosing the additional information and defendant was given a full and fair opportunity to rebut the additional testimony, any potential error would be harmless. (See *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334 [The purpose of this

The challenged evidence established both that defendant had a propensity for engaging in violence against his wife and that she and her son had previously attempted to cover up the violence to protect defendant. As such, the evidence was highly probative of defendant's guilt in this case.

While the evidence of the hotel incident is arguably more persuasive than the evidence of the charged incident because it was reported by an independent witness, the conduct involved in the incident is no more egregious that that involved in the charged offense and was not likely to evoke an unfair emotional bias against defendant. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The evidence admitted in this case is precisely the type of evidence that Evidence Code section 1109 is designed to allow.

Defendant also contends that the admission of this testimony was unduly time consuming. According to defendant, testimony about the incident consumed about 25 percent of the prosecution case. While the prosecution clearly spent a significant amount of time on this evidence, the presentation of all evidence in the case consumed less than six days. Considering the relevance of this evidence and its importance to the case, we cannot say that the trial court abused its discretion in concluding that the time required for the presentation of this testimony was not such as to require exclusion of the evidence.

---

requirement is that a defendant will not be surprised or unprepared to rebut the proposed evidence.].)

7

Finally, while the defense was undoubtedly complicated by the fact that the police investigation into the hotel incident was ongoing and discovery was continuing throughout trial, nothing in the record supports defendant's assertion that the admission of this evidence was unduly burdensome. Although defendant states summarily that "Defense counsel had no opportunity to investigate or rebut the La Quinta allegations, or to interview six witnesses identified in the People's trial brief," he offers no further argument regarding this issue on appeal and did not object or request a continuance on the basis of surprise or an inability to properly prepare for these witnesses. At most, defendant argued, only after the hotel manager had already testified, that additional testimony by the responding officers and Dr. Emerson should be excluded because that evidence was too prejudicial because "[t]hat case has not even gone to preliminary hearing" and he was "just now getting reports" and photographs from the incident. But, as just noted, defendant did not request a continuance or claim an inability to prepare a defense.

Accordingly, we find no error in the admission of the challenged propensity evidence.

**2.     The prosecution did not violate defendant's due process rights by failing to disclose material, exculpatory evidence**.

Under *Brady v. Maryland* (1963) 373 U.S. 83, 87, the prosecution violates a defendant's right to due process when it suppresses evidence that is favorable to the defendant and the evidence is material either to guilt or to punishment. "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*In re Sassounian* (1995) 9 Cal.4th 535, 544.) This includes evidence that reflects upon the credibility of material witnesses. (*Giglio v. United States* (1972) 405 U.S. 150, 154–155; *People v. Ruthford* (1975) 14 Cal.3d 399, 408, overruled on another ground in *Sassounian*, pp. 545–546, fn. 7.) Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the defendant's criminal proceeding would have been different. A reasonable probability

means a probability sufficient to undermine confidence in the outcome. (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

Defendant contends his conviction must be reversed because the prosecution failed to disclose a search warrant executed at Williams's home ten days prior to trial, apparently seeking evidence of Williams's involvement in narcotics offenses. Initially, the Attorney General questions whether a search warrant is admissible for impeachment and notes that in any event, the search warrant was not "suppressed" because defendant was aware of the search prior to trial. (*People v. Morrison* (2004) 34 Ca1.4th 698, 715.) The Attorney General's primary argument, however, is that the allegedly suppressed evidence was not material. (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1108 [Brady error reversible only when evidence is "material" and "there is a reasonable probability that, absent the error, the fact finder would have had a reasonable doubt respecting guilt."].) Because we agree that the evidence was not material, we need not consider the Attorney General's other arguments.

Although the search warrant may have supported Christian's testimony that her sister was involved in illegal activity, such involvement has nothing to do with the charges against defendant being tried, and reflects only marginally, if at all, on Williams's credibility. Given the substantial evidence of prior domestic abuse between defendant and the victim, including the existence of a restraining order and the testimony regarding the hotel incident, it is not reasonably likely that introduction of evidence suggesting Williams's involvement in illegal activity would have caused the jury to credit Christian's claim that she was assaulted by an unidentified friend of Williams rather than by defendant. Christian's version of the assault was so lacking in credibility that the additional evidence would not reasonably have resulted in a different outcome.

3.     **Defense counsel did not render ineffective assistance by failing to present evidence impeaching Williams**.

Defendant contends his attorney rendered ineffective assistance by failing to impeach Williams using the "numerous examples of her criminality and dishonesty" that had been provided in discovery. He acknowledges that Williams did not testify but argues

9

that her out-of-court hearsay statements, that were admitted through testimony by the responding police officers, were subject to impeachment under Evidence Code section 1202.[3] Assuming that such impeachment evidence was, in fact, contained in the police reports,[4] we need not decide whether defense counsel's performance was deficient because any deficiency in this regard was not prejudicial. Even assuming that the impeachment evidence would have caused the jury to view some of Williams's description of events with distrust, such doubts were not likely to overcome the fact that Williams called the police for help and reported that defendant had kidnapped his wife. In view of this testimony and the additional evidence discussed above—the wife's appearance when the police arrived, the prior hotel incident and the protective order against defendant—the evidence of defendant's guilt was overwhelming.

4.      **Substantial evidence supports defendant's conviction for obstructing or delaying a peace officer.**

Defendant contends he had no obligation to open his front door to the officers when they knocked on his door and called his phone, and thus, his failure to failure to do so did not, as a matter of law, violate section 148.[5] We disagree.

" 'The legal elements of a violation of section 148, subdivision (a) are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the

---

[3] Evidence Code section 1202 provides in relevant part "Any . . . evidence offered to attack or support the credibility of [a hearsay] declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

[4] As the Attorney General notes, defendant fails to identify the specific felony convictions or instances of conduct evidencing moral turpitude found in the police reports that he believed his attorney should have introduced to impeach Williams's credibility.

[5] Section 148, subdivision (a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

performance of his or her duties. [Citations .]' [Citation.] The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." (*In re Muhammed C*. (2002) 95 Cal.App.4th 1325, 1329.)

Contrary to defendant's argument, the evidence that defendant refused to answer the door and turned off the lights in an attempt to hide from the police is sufficient to support the finding that he delayed or obstructed the officers. (*People v. Allen* (1980) 109 Cal.App.3d 981, 987.) There is no doubt that the officers were engaged in the performance of their duties when they knocked on defendant's door and attempted to gain entry to search for Christian. There is also substantial evidence that defendant had notice the people attempting to gain entry to his home were police officers. They were wearing their uniforms and they repeatedly yelled out they were police officers and directed him to open the door. Rather than open the door, defendant turned off the lights and hid. Although R. denied at trial that he had heard the officers banging on the door, he was impeached by his prior statement to the defense investigator that they had heard the officers and that defendant was afraid to open the door to the police because he thought they might shoot him.

In *People v. Allen, supra*, 109 Cal.App.3d at pages 985-986, the court explained, "the language of the California statute (Pen. Code, § 148) . . . uses the word 'delays' in addition to 'resists' and 'obstructs.' Since the officer had the legal right, indeed duty, [citation] to detain appellant, appellant, if he was aware of the officer's desire, had the concomitant duty to permit himself to be detained. [Citation.] Therefore, on the face of the statute it would appear that the physical activity that appellant engaged in, flight and concealment, which delayed the officer's performance of his official duty, violated the statute." As set forth above, substantial evidence establishes that the defendant knew the officers were at his home to speak with him about the altercation involving his wife and there is no dispute that based on Williams's statements the police had probable cause to detain and arrest defendant. Defendant's conduct in turning out the lights and hiding from the officers undoubtedly delayed his detention and arrest.

11

Defendant reliance on *People v. Wetzel* (1974) 11 Cal.3d 104 is misplaced. In that case, the court held that defendant's mere passive, presence in the doorway and refusal to consent to the search of her home, when responding to the officer's knock, did not support a violation of section 148. (*Wetzel,* pp. 108-109 ["Although she had positioned herself in the open doorway, it appeared to be the only position she could assume while conversing with the officers. [Fn. omitted.] Had she complied with the officer's requests and stood back from the doorway this in itself would have, under the circumstances, constituted the very consent which she was not required to give."].) The court noted, however, that a valid distinction can be drawn where there evidence that the defendant had not merely remained passive but instead engaged in conduct that created an additional obstacle to the officer's entry. (*Id.* at p. 110.) Such distinguishing facts are present here. Defendant did not remain passively inside his home. He turned out the lights and hid from the officers, which in turn delayed their entry into the home. (See *People v. Allen, supra,* 109 Cal.App.3d at p. 987, fn. 1 [distinguishing *Wetzel* as follows: "The case at bench is distinguishable because appellant actively impeded an officer in the performance of his duty. The defendant in *Wetzel* could refuse consent, but could not impede entry. Appellant could refuse to cooperate, but could not run and hide."].)

**5**.     **Substantial evidence supports the prior serious felony enhancement**.

Defendant's sentence was enhanced five years as a result of the court's finding that his 1982 conviction for assault constituted a serious felony under section 667, subdivision (a)(1). As defendant notes, a prior assault conviction alone does not qualify as a serious felony under section 667, subdivision (a)(1). (*People v. Williams* (1990) 222 Cal.App.3d 911, 914–915.) As relevant in this case, the judge must also have found that defendant personally inflicted great bodily injury on a non-accomplice for defendant's assault conviction to constitute a prior serious felony conviction. (§§ 667, subd. (a)(4), 1192.7, subd. (c); *People v. Williams*, *supra*, 222 Cal.App.3d at pp. 914–915.) Defendant contends there is insufficient to establish the great bodily injury requirement.

In this case, the prosecution introduced the abstract of judgment from defendant's 1982 conviction to prove the serious felony enhancement. The abstract shows a plea of

guilty in 1982 to the charge of violating former section 245, subdivision (a) (now subdivision (a)(1)). The abstract also shows that a section 12022.7 enhancement, which requires an additional and consecutive three-year term for defendants who personally inflict great bodily injury on a non-accomplice, was charged and found true but was stayed. Defendant acknowledged pleading guilty to section 245, subdivision (a) in the prior case, but denied that he also plead guilty to a great bodily injury allegation.

Contrary to defendant's argument, the abstract of judgment is sufficient to support the court's finding that defendant had suffered a prior serious felony conviction. (*People v. Ruiz* (1999) 69 Cal.App.4th 1085, 1090-1091; *People v. Milosavljevic* (1997) 56 Cal.App.4th 811, 815; *People v. Shirley* (1993) 18 Cal.App.4th 40, 47.) The trial court was entitled to credit the abstract of judgment over defendant's self-serving testimony that he did not remember being charged with or pleading guilty to the great bodily injury enhancement.

**6.** **The trial court did not abuse its discretion by sentencing defendant to the upper term on his kidnapping conviction**.

When, as here, the statute under which the defendant is convicted specifies three possible terms, the decision to impose the upper, middle or lower term rests within the sound discretion of the court. (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(a).[6]) In making his selection, "the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision." (Rule 4.420(b); see also *People v. Black* (2007) 41 Cal.4th 799, 813.) It is up to the sentencing judge to decide how much weight should be given to the pertinent circumstances. (*People v. Brown* (1988) 46 Cal.3d 432, 470.) The judge may minimize or disregard circumstances in mitigation (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401) and impose the upper term based on but a single factor in aggravation (*People v. Osband* (1996) 13 Cal.4th 622, 730).

In sentencing defendant the court relied on the following factors: (1) the victim was vulnerable (rule 4.421(a)(3)); (2) defendant engaged in violent conduct that indicates

[6] All further rule references are to the California Rules of Court.

a serious danger to society (rule 4.421(b)(1)); (3) defendant's prior convictions are numerous and/or increasing in seriousness (rule 4.421(b)(2)); (4) defendant served a prior prison term (rule 4.421(b)(3)); (5) defendant performance on probation and/or parole was unsatisfactory (rule 4.421(b)(5)); and (6) the crime involved a threat of great bodily harm and/or a high degree of cruelty or callousness (rule 4.421(a)(1)). The judge also noted that he "looked long and hard for circumstances in mitigation, and in trying to identify such [he] read the letters [submitted by defendant]. And what the letters suggest is that [defendant] is capable of very significant contributions to his community [and] that for many people in his church and in other organizations he has been a role model and he has been very helpful. [¶] The problem, however, and I think this is true of domestic violence generally, is that the side of [defendant] that his wife saw and the side of [defendant] that his son saw and in the case of the San Mateo conduct which was the subject of significant and important testimony in this case, the side of [defendant] that the motel manager saw, is a very different side of [defendant]. [¶] It's a side of a person who is capable of remarkable acts of cruelty to a woman who is the mother of his son, and in both instances, the evidence indicates that that cruelty was inflicted upon her in the presence of the 16-year-old son which creates a horrendous role model for his son to see[.] [T]he kind of violence and cruelty perpetrated upon his mother that was the subject of the testimony in this case will no doubt have life-long and devastating effects on his son, both with regard to his view of his mother, his father, and I fear with regard to how he treats women in the future."

Defendant asserts that the aggravating factors referenced by the court were improper.[7] He argues that (1) the court erred in using victim vulnerability as an

---

[7] As the Attorney General notes, defendant did not challenge the trial court's use of these factors in selecting the upper term at the time of sentencing. However, to forestall an ineffective assistance of counsel claim, we address the merits of defendant's claim notwithstanding trial counsel's failure to object to the sentence in the trial court. (*People v. Scaffidi* (1992) 11 Cal.App.4th 145, 151; *People v. Scott* (1994) 9 Cal.4th 331, 354–355 [challenges to discretionary sentencing choices forfeited on appeal if not raised in the trial court].)

aggravating factor because there was no evidence that Christian was more vulnerable than other victims of domestic violence; (2) the court erred in using unsatisfactory performance on probation or parole as an aggravating factor because there is no evidence that defendant's performance was unsatisfactory; (3) the trial court erred by using high degree of cruelty or callousness as an aggravating factor because he improperly justified that choice using evidence of the La Quinta Hotel incident; and (4) the trial court erred by using "violent conduct that indicates a serious danger to society" as an aggravating factor because violence was an element of the offense.

When a trial court gives both proper and improper reasons for a sentence choice, we will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. (*People v. Price* (1991) 1 Cal.4th 324, 492.) We do not necessarily agree that the first three factors challenged by defendant (victim vulnerability, probation performance, and the cruelty/callousness of the crime) were improperly considered, but in all events it is clear that the court properly relied on the remaining factor (defendant's violent conduct) and the court undoubtedly would have selected the upper term based on this factor alone.[8]

Per rule 4.421, "Circumstances in aggravation include factors relating to the crime and factors relating to the defendant." Among "[f]actors relating to the crime" is whether "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (*Id.*, subd. (a)(1).) Among the factors relating to the defendant, is whether "defendant has engaged in violent conduct that indicates a serious danger to society." (*Id.*, subd. (b)(1).) The factor focusing on whether a crime involved great violence or a threat of bodily harm is not identical to the factor that examines whether a defendant poses a serious danger to

---

[8] Although defendant claims that all six factors cited by the court were improper, defendant does not offer any argument challenging the court's reliance on the number and/or increasing severity of defendant's prior convictions or the fact that he had served a prior prison term. Although these factors alone may have supported the court's selection of the upper term, the court did not place any particular emphasis on these factors in explaining its selection.

society. These sentencing factors are separate and distinct: one deals with the nature of the crime, the other with the nature of the defendant.

In this case, the court relied heavily on defendant's overall violent conduct towards his wife, focusing primarily, as quoted above, on the assault that took place in the presence of his son at the La Quinta Hotel. Although the court could not rely on the facts relating to the hotel incident to conclude that the charged offense involved a high degree of cruelty or callousness under rule 4.421(a)(1), the violence displayed during that incident was certainly relevant to the court's finding that defendant had engaged in violent conduct that posed a serious danger to society under rule 4.421(b)(1).

Finally, contrary to defendant's suggestion, the court did not decline to consider any factors in mitigation identified in defendant's sentencing memorandum. Rather, after reading the letters, the court concluded that any benefit he may be to his community was far outweighed by the serious danger to society posed by defendant's violent conduct.[9]

### Disposition

The judgment is affirmed.

_____
Pollak, Acting P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

_____

[9] Defendant contends the cumulative effect of the alleged errors denied him a fair trial. Finding no error or resulting prejudice, we reject the claim of cumulative error. (*People v. Tully* (2012) 54 Cal.4th 952, 1061.)